**Lady Evelyn BOOTH, et al Plaintiffs**

v.

**VERITY, INC, et al. Defendants**

**No. CIV. A. NO. 3:00–CV–83–H.**

United States District Court,
W.D. Kentucky.
at Louisville.

Dec. 19, 2000.

Inc. ("Verity"), one of the Defendants. The other defendants are the eleven individual directors[1] of Verity ("Defendant Directors"). Plaintiffs assert that Defendants' optimistic statements to market analysts, combined with their failure to warn investors that revenues would fall short of analysts' projections, fraudulently induced Plaintiffs to purchase Verity securities at inflated prices.

All Defendants have now moved to dismiss the complaint. The Defendant Directors say that this Court is without personal jurisdiction, while Defendant Verity argues that Plaintiffs have not pled their case with sufficient particularity. The Court will discuss each issue in turn.

## I.

Plaintiffs Lady Evelyn Booth ("Booth") and David Austin Wise ("Wise") purchased shares and options in Verity between December 1, 1999 and December 14, 1999. At one time Booth held 4,930 shares purchased at prices ranging between $50.00 and $58⅞₆ per share and Wise held three option contracts on Verity stock purchased at $10¾ per share. On December 14, 1999 Verity's stock fell 46% after the Company announced quarterly earnings would be lower than expected. By December 15, 1999 Verity's share price declined as low as $23.88. Because of this dramatic decline Booth, facing a margin call, was forced to close out her Verity positions and Wise could not exercise his options. Plaintiffs allege that the high price at which they bought their shares and the low price which forced Booth to sell her shares and prevented Wise from exercising his options was caused by the fraudulent statements and material omissions of Verity and the Defendant Directors.

Verity is a publicly traded corporation listed with NASDAQ (National Association of Securities Dealers Automatic Quotation

Robert A. Florio, Louisville, KY, for Plaintiffs.

Phillip W. Collier, Stites & Harbison, Louisville, KY, for Defendants.

## MEMORANDUM OPINION

HEYBURN, District Judge.

This case is brought under the Kentucky Blue Sky laws. Plaintiffs are two individual citizens of Kentucky who at one time owned stock or stock options in Verity,

---

1. The individual Defendant Directors are: Gary J. Sbona, Stephen W. Young, James E. Ticehurst, Anthony J. Bettencourt, James A. Garvey, Hugh S. Njemanze, Ronald F.E. Weissman, Thomas E. Gardner, Todd K. Yamami, Steven M. Krausz, Stephen A. MacDonald, and Charles P. Waite, Jr.

System). Its principle business is the development, marketing, and support of "knowledge retrieval software." A large portion of Verity's revenue comes from a small number of contracts such that the company's quarterly revenue and Estimated Price per Share ("EPS") estimates are highly sensitive to news about the company's ability, or lack thereof, to close certain large contracts.

The Individual Defendants are senior executives and/or directors of Verity. Plaintiffs allege that the Individual Defendants possessed the power and authority to control the contents of Verity's presentation to securities analysts and the general market. Further, these defendants had access to material non-public information concerning Verity's business prospects which was willfully concealed from Plaintiffs and the general public.

The complaint alleges that Verity engaged in a series of statements and omissions that, taken together, constitute fraud. Beginning on September 15, 1999, Verity announced extraordinary earnings results of $19.8 million for its first fiscal quarter of 1999 ("1FQ"), a 50% increase over the same period from the previous year. Plaintiffs attributed these earnings to the success of several large contracts with major corporations. Plaintiffs contend that this news and the enthusiastic, sincere manner in which the Company presented it, caused the stock price to rise from the $15 to $20 per share range at which it had traded during the first nine months of 1999 to around $40.00 per share by November, 1999.

In early October, 1999 the financial press reported that Verity was negotiating three large contracts. Plaintiffs assert that "Verity senior management" made "several false and misleading statements" and omitted material facts related to these contracts and the Company's business prospects. In general terms, the complaint alleges that the Company disseminated information to analysts which "over stated assessments of Verity's future business prospects, stated that Verity had, in fact, closed contracts it had not closed, and that Verity would report a 2FQ earnings figure in line with analyst expectations." Notwithstanding these statements, the Company was "well aware" that analyst EPS expectations were more than 50% higher than they actually could be by the close of 2FQ on November 30, 1999, and that these false EPS estimates were widely reported and relied on by the market.

The complaint specifically quotes an S.G. Cowen Securities report by analyst Drew Brosseau, dated November 12, 1999 and "based on conversations with Verity management," as an example of the sort of news reported at that time:

> [W]ith about 3 weeks left, Q2 (November) is shaping up well. Business closings through the first two months were on track and the pipeline of business in running well ahead of what's needed to make our estimates of $21.MM (+41%) in revenues and [$.11] (vs.[$.06]) in EPS.

This sort of report led to a "general consensus among financial analysts that Verity would hit QF2 earnings." Verity's 2FQ ended on November 30, 1999 with no warning regarding the company's earnings shortfall for that quarter. On three previous occasions the Company preannounced shortfalls in quarterly earnings expectations.

In fact, Defendants encouraged bullish market expectations when Defendants Sbona and Bettencourt spoke to "market participants" stating, *inter alia*, that: "(1) Verity continued to dominate its category; (2) Verity had been strong during QF2; (3) Verity was on track to have over $90 million in revenues in F00." Later, on December 7, 1999 Verity management advised Jason Maynard of the Seidler Companies of earnings forecasts for F00 and F01 of $.49 and $.64, respectively which indicated a 35% EPS growth rate. Specifically, this report forecast EPS 2FQ at $.12 which turned out to be off by nearly

$.08. Since Verity's 2FQ for F00 had already closed on November 30, 1999, this report concealed revenue and EPS shortfalls Verity had already suffered for 2FQ, 2000.

Verity disclosed its actual 2FQ earnings on December 14, 1999 in a press release:

> "Verity Inc. (Nasdaq: VRTY), a leading provider of enterprise and Internet knowledge retrieval solutions, today reported financial results for its second fiscal quarter ended November 30, 1999.
>
> \*  \*  \*  \*  \*  \*
>
> ...[T]his quarter's revenue performance was lower than Verity expected due to a delay in closing three large transactions, rather than a lessening in demand for Verity's products or services. Two of the three transactions that did not close have now been closed. Verity is still aggressively working, and expects to close, the third transaction."

In a conference call following this press release Defendant Sbona stated:

> "Clearly, as we had stated and the facts remain, it was the best interest for shareholder value rather than come out and have a preannouncement saying that we in fact...anticipate missing our projected revenue. We thought that within a matter of just a few days we could get one firm absolute audited numbers that we could talk in terms of, not just the revenue, preliminary revenue projections, but also the financial performance, as well as having the status of where those deals were. That would give people a far better view of what the value of Verity was, rather than the thing whip-sawed back and forth based on speculation."

Based upon these facts, Plaintiffs allege two causes of action against Defendant Directors and one against Verity. The first cause of action, asserted only against Defendant Directors, alleges breach of fiduciary duty by disseminating false information and failing to mention certain facts, all of which fraudulently misled Plaintiffs.

The second cause of action alleges that all Defendants violated two provisions of Kentucky's Blue Sky law, KRS § 292.320 and § 292.480.

## II.

Before considering Defendants' substantive arguments, this Court must determine whether it has jurisdiction as to the individual Defendant Directors. *See Burnham v. Superior Court,* 495 U.S. 604, 608–09, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990). Because jurisdiction in this case is based on diversity of citizenship, this Court must apply Kentucky law. *Stalbosky v. Belew,* 205 F.3d 890 (6th Cir.2000); *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

▇▇ In these circumstances, this Court has three options: decide the motion solely by the parties' affidavits; permit discovery in aid of deciding the motion; or conduct an evidentiary hearing to resolve any apparent factual questions. *See Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir.1991). The choice is left to this Court's discretion. *Id.* Plaintiffs bear the burden of establishing jurisdiction and, confronted by a properly supported motion to dismiss, they may not rely on pleadings alone but must, "by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Id.,* (citing *Weller v. Cromwell Oil Co.,* 504 F.2d 927, 930 (6th Cir.1974)). "Where a court relies solely on the parties' affidavits to reach its decision, the plaintiff must make only a prima facie showing that personal jurisdiction exists in order to defeat dismissal." *Id.* A court must view the plaintiff's allegations in the light most favorable to the plaintiff and cannot consider defendant's statements contradicting these allegations. *See Id.* at 1462; *CompuServe v. Patterson* 89 F.3d 1257, 1262 (6th Cir.1996). Where there is no reasonable basis to expect that further discovery would reveal contacts sufficient to support personal jurisdiction it is not an abuse of discretion to deny discovery.

*Chrysler Corp. v. Fedders Corp.* 643 F.2d 1229, 1240 (6th Cir.1981).

The Court must look first to Kentucky's long arm statute. It provides that:

A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from the person's:

1. Transacting any business in this Commonwealth;

2. Contracting to supply services or goods in this Commonwealth;

3. Causing tortious injury by an act or omission in this Commonwealth;

4. Causing tortious injury by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth, provided that the tortious injury occurring in this Commonwealth arises out of the doing or soliciting of business or a persistent course of conduct or derivation of substantial revenue within the Commonwealth.

Ky.Rev.Stat. Ann. ["KRS"] § 454.210(2)(a) (Michie 2000).

■ Generally, the Kentucky Long Arm Statute is thought to authorize jurisdiction consistent with the Due Process Clause of the United States Constitution. It requires that a nonresident defendant have sufficient contacts with the forum state so that the district court's exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In the Sixth Circuit, a three part test is applied to determine whether a given defendant meets the International Shoe standard:

1. Has the defendant purposely availed himself of a privilege in the forum state or purposely caused a consequence in the forum state?

2. Does the cause of action arise from the defendant's activities in the forum state?

3. Is the connection between the defendant's acts and the forum state substantial enough to make the exercise of jurisdiction over the defendant reasonable?

*See CompuServe Inc. v. Patterson,* 89 F.3d 1257, 1263 (6th Cir.1996) (quoting *Reynolds v. International Amateur Athletic Fed'n,* 23 F.3d 1110, 1116 (6th Cir.1994) and citing *Southern Mach. Co. v. Mohasco Indus.,* 401 F.2d 374, 381 (6th Cir.1968)).

■ Here, Plaintiffs argue that selling stock, or stock options to Kentucky residents qualifies as "soliciting business" in Kentucky under KRS § 454.210(2)(a). They further say that leaks to the news media that reached plaintiffs over "the public airwaves, periodicals, telephone, the Internet and other sources" are acts and omissions occurring outside Kentucky arising out of the Defendant's solicitation of business in Kentucky, thus satisfying KRS § 454.210(2)(a)4. They say that Verity and the Defendant Directors have purposefully reached out to Plaintiffs in Kentucky, that their injury is closely connected to this contact, and that the combination of these factors makes the exercise of jurisdiction over the Defendant Directors fair and reasonable under the Due Process Clause.

The Due Process Clause, and by implication KRS § 454.210(2)(a)4, requires, at a minimum, an act purposefully directed at Kentucky. The Court finds no evidence that the Defendant Directors have undertaken such an act. Plaintiffs assertion that the Defendant Directors have "done everything within their respective powers to reach Plaintiffs in Kentucky" does not "set forth specific facts showing that the court has jurisdiction." *Theunissen,* 935 F.2d at 1458. Though Plaintiffs assert that the Defendant Directors sold stock to them in Kentucky, Plaintiffs have not alleged any act to accomplish this. Nor have Plaintiffs alleged any advertisement

in Kentucky or even that they sold the stock or stock options directly to Plaintiffs. Purchasing securities in a secondary market located outside of Kentucky does not establish a contact with Kentucky. Nor is the mere ability to view a passive web page or mass media report a contact with Kentucky rendering Defendants subject to the jurisdiction of Kentucky courts. *See Auto Channel, Inc. v. Speedvision Network* LLC, 995 F.Supp. 761, 765 ("the fact that Internet users in Kentucky can view advertisements on web pages...falls far short of demonstrating that Defendants advertise in Kentucky."). Kentucky's securities law specifically states that for the purposes of KRS § 292.320 and § 292.480 an "offer to sell" does not occur in the state of Kentucky when it is made by means of a newspaper or radio broadcast originating outside the state. KRS § 292.313.

No affidavits, allegations or evidence supports the conclusion that this Court has jurisdiction over the Defendant Directors. If any of the Defendant Directors purposefully reached out to Plaintiffs in Kentucky, facts establishing such a contact would be apparent to Plaintiffs and could easily be alleged by affidavit. There is no reasonable likelihood that discovery would reveal contacts establishing Kentucky's jurisdiction. Therefore, Plaintiffs claims against the Defendant Directors—which includes all those in its first cause of action—must be dismissed on this ground alone.

### III.

Plaintiffs second cause of action alleges that Defendants violated certain provisions of Kentucky's Blue Sky law, specifically KRS § 292.320 and § 292.480.[2] The threshold issue for deciding Plaintiffs' Blue Sky claims is whether to construe KRS Section 292 in harmony with federal securities law so as to include the tougher pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. 78u-4 (2000). The Kentucky Supreme Court has yet to consider this particular issue. Therefore, this Court must predict how Kentucky courts would decide such a case. *See Welsh v. United States,* 844 F.2d 1239, 1245 (6th Cir.1988) ("[O]ur task [in a diversity case] is to make our best prediction, even in the absence of direct state court precedent, of what the Kentucky Supreme Court would do if it were confronted with this question.").

Before 1995, allegations of securities fraud were subject to the same heightened pleading standards as general allegations of fraud covered by Rule 9(b) of the Federal Rules of Civil Procedure.[3] However, Congress concluded that those pleading requirements were "not adequate to preventing abuse of securities laws by private litigants." H.R. Conf. Rep. No. 104–369 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 818. Consequently, to discourage frivolous securities fraud claims Congress passed the PSLRA which required that a private securities action allege particular facts giving rise to a "strong inference" of the required state of mind. 15 U.S.C. § 78u–4(b)(2). S.Rep. No. 104–98 (1995). For a variety of reasons, this Court concludes that Kentucky courts would apply the PSLRA's new pleading standards.

Kentucky state courts and federal courts applying Kentucky law have consistently noted that the language of Kentucky's Blue Sky statute parallels federal securities law, and have construed Section 292 as sharing the same purpose as federal securities law. *See Carothers v. Rice,* 633 F.2d 7, 15 (6th Cir.1980) (holding that, while Kentucky's blue sky law is not "exactly like" the federal action, they "share the same language and the same specific pur-

---

**2.** In view of its jurisdictional conclusions, the Court need now only apply these claims as to Verity, Inc.

**3.** Rule 9(b) required that where a plaintiff avers fraud, "the circumstances constituting fraud or mistake shall be stated with particularity."

pose"); *Herm v. Stafford,* 663 F.2d 669, 678 (6th Cir.1981) (applying Kentucky Blue Sky statute of limitations to actions brought under Section 10(b) of the 1934 Act on the ground that "the language of § 292.320 is nearly identical with rule 10(b)–5, [and] that both statutes have the same purpose..."); *Smith v. Manausa,* 385 F.Supp. 443, 447 (E.D.Ky.1974) ("The Kentucky 'Blue Sky' legislation essentially parallels the federal acts...[Ky. Rev. Stat. Ann.] § 292.320(1) duplicates Rule 10b–5").

■ In fact, Kentucky's Blue Sky law is an adaptation of the Uniform Securities Act of 1956, as amended in 1958, which the Kentucky legislature enacted in 1960. *See* Unif. Securities Act 1956 Prec. § 101, Refs & Annos, 7B U.L.A. 509 (1999). In KRS. § 292.530(2) the Kentucky legislature explicitly adopted the policy of the Uniform Securities Act stating that "this chapter shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it [the Uniform Securities Act] and to coordinate the interpretation and administration of this chapter with the related federal regulation." To interpret provisions of Blue Sky Laws patterned after the Uniform Securities Acts, other state courts have looked to decisions construing parallel federal securities laws. *See e.g.* *Carothers* 633 F.2d at 10 (finding that "Kentucky's Blue Sky Law is largely drawn from the Uniform Securities Act"); *McCall v. Finley,* 294 S.C. 1, 7, 362 S.E.2d 26 ("[South Carolina's Blue Sky Law] is similar to the federal Securities Act of 1933...[i]n the absence of South Carolina authority, we look to federal cases for guidance.").

Construing Kentucky securities law in harmony with federal securities law furthers both federal and Kentucky policy underlying securities regulation. Congress has found that since the passage of the PSLRA in 1995 there has been a significant migration in securities fraud cases from federal to state courts. *See* Findings in Support of the Securities Litigation Reform Act of 1995, Pub.L. No. 105–353, 112 Stat. 3227. Congress further found that this shift undermined the PSLRA's objective of preventing abuses in private securities fraud lawsuits and it enacted the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") to remedy abuse by state private securities fraud lawsuits. *Id.* Congress also emphasized that "[s]tate securities regulation is of continuing importance, together with Federal regulation of securities, to protect investors..." *Id.* To construe Kentucky's Blue Sky law independent of federal standards would encourage forum shopping and would undermine the uniformity Congress found necessary for the fair and efficient regulation of nationally traded securities. *See* Michael A. Perino, *Fraud and Federalism: Preempting Private State Securities Fraud Causes of Action,* 50 Stan. L.Rev. 273, 316 (1998) ("If plaintiffs' attorneys can recast federal claims under alternative state causes of action and bring those claims in an alternative state forum, then congressional attempts to address problems in securities litigation may well prove futile."). Parallel construction of state and federal securities laws resolves this problem by creating uniform national standards for securities law enforcement without depriving states of their important role in protecting their citizens from securities fraud.

Kentucky courts have generally adopted expansive policies to aid consumers to redress injuries. However, Kentucky courts have more experience and expertise in products liability and personal injury matters than in the securities arena. There are few reported Kentucky Blue Sky cases and Kentucky courts [4] have traditionally followed the federal lead in this area. *See e.g., Boggess v. Commonwealth,* 447 S.W.2d 88, 92 (1969) (looking to federal cases construing Rule 10b–5 to interpret KRS § 292.320); *Queen v. Common-*

---

4. A Westlaw search of cases construing KRS § 292.320 revealed just fifteen reported cases, nine of which were by federal courts construing Kentucky law.

*wealth*, 434 S.W.2d 318, 324 (1968) (considering a challenge to § 292.320 and concluding "a similar attack on the substantially identical provisions of the Federal Securities act was rejected by a federal court..."). To do so in this instance is consistent with the policy of the majority of states that have adopted the Uniform Securities Act. *See* Unif. Sec. Act.1956 Prec. § 101, Refs & Annos, 7 U.L.A. 509 (2000) (listing 35 states that have adopted the U.S.A. of 1956).

The Court concludes that Kentucky's securities law should be construed as parallel to federal securities laws so as to incorporate the recent statutory reforms and the related judicial decisions.

## IV.

The Court will next consider Plaintiffs' claims of securities fraud under KRS § 292.320.[5] The Court must accept as true "well pleaded facts" set forth in the complaint. *In re Comshare Inc. Securities Litigation*, 183 F.3d 542, 547 (6th Cir.1999) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987)). The Court must decide whether those facts support an inference that defendants acted with type of "scienter" or state of mind that renders them liable for securities fraud under section 292.320. Section 292.320 does not itself define the scienter requirement nor has the Kentucky Supreme Court considered the issue. However, the scienter requirement under rule 10b–5 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), is well defined.

■ To state a claim under Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5 a plaintiff must allege, "in connection with the purchase and sale of securities, the misstatement or omission of a material fact made with scienter, upon which the plaintiff justifi-

ably relied and which proximately caused the plaintiff's injury. *In re Comshare, Inc. Securities Litigation*, 183 F.3d 542, 548 (6th Cir.1999). As applied to federal securities laws, "scienter" is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

To make their case, Plaintiffs must meet the PSLRA's heightened pleading standards. The PSLRA specifically states:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u–4(b)(2) (2000).

The PSLRA does not define a "strong inference" and the various circuit courts have not reached a consensus as to its precise meaning. Notwithstanding this dispute, the standard in the Sixth Circuit is clear.

■ To raise a "strong inference" that defendants acted with the requisite scienter plaintiffs must plead facts that "give rise to a 'strong inference of recklessness' of the kind required for securities fraud liability." *Comshare* 183 F.3d at 553. In the context of securities fraud, "recklessness" is a lesser form of intent rather than a greater degree of ordinary negligence. *Id.*, at 550 n. 7. Simple negligence can never be a ground for liability. *Id.* To find recklessness a court must be drawn to infer "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the

---

5. KRS § 292.320 provides in relevant part that, "it is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly...to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading..."

extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." In re *MicroStrategy, Inc.*, 115 F.Supp.2d 620, 634–35 (E.D.Va. 2000) (quoting *Hoffman v. Estabrook & Co.*, 587 F.2d 509, 517 (1st Cir.1978)). Recklessness of this sort entails that plaintiffs plead facts indicating either that the defendants made errors "so obvious that any reasonable man would have known of [them]" or that certain "red flags" existed that should have put Defendants on notice that their statements or omissions were likely to cause plaintiffs harm. *Comshare* 183 F.3d at 553.

### A.

In our case, Plaintiffs allegations of Verity's malfeasance fall into two general categories: optimistic statements regarding Verity's prospects made before November 30, 1999 (the close of 2FQ); and the single EPS report made on December 7, 1999, approximately one week after the close of 2FQ.

■ The first category of statements clearly fall short of the standard set forth in *Comshare*. Plaintiffs have alleged that Verity management knew they were misleading but without more specific facts showing Defendant's knew the statements were false or likely to be false, these are merely the sort of conclusory allegation explicitly rejected in *Comshare*. *Id.* at 553 ("Although Plaintiffs speculate that it is likely that Defendants knew of the GAAP violations because they occurred over a long period of time, claims of securities fraud cannot rest 'on speculation and conclusory allegations.'" (citations omitted)).

To be sure, at some point before the end of November, 1999 Defendants knew that the three contracts would not close. But it is equally apparent that Defendants believed the contracts would close soon after the close of 2FQ. No fact by itself, and none of the facts taken together, constitute a "red flag" which would have put Defendants on notice that they were acting at Plaintiffs' peril and which Defendants ig-nored. Toward the end of November or after the first of December, Defendants chose to hold off any pre-announcement because such a statement in itself could be misleading. The Court is mindful that "mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Comshare*, 183 F.3d at 554. For that reason, the Court finds no strong inference of recklessness in the allegations that Verity should have made an earlier earnings announcement.

■ The statement made to analyst Jason Maynard on December 7, 1999, is different in significant ways. Plaintiffs allege that Verity management reported EPS for 2FQ at $.12 when in fact it was closer to $.04. Since 2FQ had closed on November 30, 1999 the EPS estimate for 2FQ would likely have been established by December 7, 1999. One crucial word in the evidence may be Maynard's reference to being "advised." Plaintiff's complaint implies that Verity furnished Maynard with actual numbers. Of course, "advised" could also mean that Verity management supplied Maynard with general projections that turned out to be overly optimistic, the specific numbers being filled in by Maynard himself. However, given the specificity of the numbers, Maynard's statement raises a strong inference that Verity did provide specific financial numbers. Whether such facts demonstrate a strong inference of recklessness is a more difficult question. A "strong inference" should be one which is clearly superior to any other inference showing innocent conduct.

A key factor as to reckless is the timing of Maynard's reported earnings for 2QF and the Company's actual earnings for that quarter. The issue here is not whether Verity should have issued a pre-earnings statement. Rather, it is whether Verity gave out false information after the quarter closed. Once Verity decided to advise an analyst after the end of 2FQ, its statements or advice were no longer pro-

jections. The statements were more like facts. Verity would know that such statements would be considered in that context. By that time, approximately one week after quarter closed, one can surely believe that Verity knew the likely parameters of that quarter's earnings. An inference that Verity knew its actual 2FQ results is clearly superior to any other. To suggest financial results contrary to those known earnings parameters strongly suggests recklessness.

The new pleading standards are high. There is much that the pleadings do not reveal. For instance, we do not know the exact words spoken by Verity officials to Jason Maynard. Nevertheless, in these circumstances, one cannot be blind to the strong inference that Verity may have deceived the investing public. Though the precise motive for doing so escapes this Court, discovery will be permitted so that the innocent or incriminating explanation may be revealed.

## V.

KRS 292.480 parallels Section 12(2) of the Securities Act of 1933 ("Section 12"). 15 U.S.C. § 77*l* (a)(2) (2000).[5] Unlike § 292.320, fraud is not an element of § 292.480. Since the heightened pleading standards of Fed.R.Civ.P. 9(b) and the PSLRA are aimed at defining only the fraudulent mental state, these pleading standards do not apply to section 292.480. See Giarraputo v. UNUMProvident Corp., 2000 WL 1701294 (D.Me.2000) (holding that the pleading requirements of Fed. R.Civ.P. 9(b) and the PSLRA do not apply to claims brought under section 12 of the securities act of 1933).

Under section 12 of the 1933 Act, liability applies only to those who sell securities directly to the purchaser or promote

the sale of securities for their own financial gain. Pinter v. Dahl, 486 U.S. 622, 647, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); Giarraputo, 2000 WL 1701294 at *9. In Pinter, the Supreme Court reached this conclusion relying on Section 12's provision that "any person who offers or sells a security... shall be liable to the person purchasing the security from him." The court held that this language restricts liability to those who either pass title to a plaintiff or solicit a plaintiff's purchase for the purpose of financial gain. Pinter, 486 U.S. at 647, 108 S.Ct. 2063.

The majority of courts considering Section 12 subsequent to Pinter have further restricted its application to initial distributions of a security, excluding aftermarket transactions. See Fujisawa Pharmaceutical Co. v. Kapoor, 814 F.Supp. 720, 728–29 (N.D.Ill.1993) (citing numerous cases considering whether section 12(2) applies to aftermarket transactions and concluding that, "the great weight of authority" supports a general rule restricting section 12(2) to initial offerings). The rational for this rule was explained by the Eleventh Circuit in First Union Discount Brokerage Services, Inc. v. Milos, 997 F.2d 835 (11th Cir.1993) (relying on the Third Circuit's decision in Ballay v. Legg Mason Wood Walker, Inc., 925 F.2d 682 (3d Cir.1991). The court reasoned that the language of section 12(2) and the overall structure of federal securities law favors limiting section 12(2) to initial public offerings). Milos 997 F.2d at 843. Specifically the use of "prospectus" indicates that section 12(2) was primarily intended to apply to initial public offerings. Id. Further, the relationship of section 12 to the overall scheme of the 1933 and 1934 Acts suggests that section 12(2) does not apply to aftermarket trading. Id.; See also Panek v. Bogucz, 718 F.Supp. 1228,

---

**5.** KRS § 292.480 provides in relevant part that: "Any person, who offers or sells a security...by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made not misleading ... and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission is liable to the person buying the security from him..."

1232 (D.N.J.1989) (reasoning that the Securities Act of 1933 was primarily concerned with the regulation of the distribution of securities while the Securities Act of 1934 was concerned with post-distribution trading and since section 12(2) is part of the '33 Act it should be limited to initial offerings).[6]

This Court agrees with the majority's rational. Applying section 12(2)'s more relaxed scienter standard for any misstatement or omission to aftermarket securities transactions would duplicate other anti-fraud provisions of the securities laws (such as rule 10(b)–5) without the heightened scienter and pleading standards attached to those other provisions. This would effectively subvert the PSLRA's reforms seeking to curb abuse of the securities laws. Section 12(2) does not apply to typical aftermarket securities transactions.

Section 292.480 uses language similar to that used in Section 12 and is part of a similar statutory scheme. Liability runs against "any person who offers or sells a security" to "the person buying the security from him." Unlike section 12 Section 292.480 does not use the word "prospectus" in proscribing the means of communication for which liability will attach. The use of "prospectus" was significant in the decision of courts construing 12(2) as excluding aftermarket transactions but it was not dispositive. *See e.g., Ballay*, 925 F.2d at 693 (holding that "the language and legislative history of section 12(2), as well as its relationships to sections 17(a) and 10(b) within the scheme of the 1933 and 1934 Acts, compel our conclusion that section 12(2) applies only to initial public offerings and not to aftermarket trading"). Giving effect to the entire scheme of Kentucky's securities law favors

limiting KRS § 292.480 to initial offerings or the exceptional aftermarket sale that is substantially similar to an initial offering. Construing § 292.480 in harmony with the Supreme Court's reading of Section 12, this Court concludes that KRS § 292.480 imposes liability on only the buyer's immediate seller: remote purchasers are precluded from bringing actions against remote sellers. See *Pinter* 486 U.S. at 644 n. 21, 108 S.Ct. 2063.

Since Plaintiff's allege neither that title to the securities passed from Defendants nor that their purchase was anything but a typical secondary market transaction, they cannot sustain a claim under KRS § 292.480.

### VI.

The Court's conclusions here raise other issues. At the very least, there may be questions of causation as to any transactions prior to December 7, 1999, and perhaps with respect to some transactions after that date. The Court will enter an order consistent with this Memorandum Opinion. In addition, the Court will set a pretrial conference in the near future.

### ORDER

Defendants have moved to dismiss the complaint on various grounds. Having reviewed the memoranda of the parties and being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motion to dismiss is SUSTAINED as to the Defendant Directors based upon the absence of personal jurisdiction and the Defendant Directors' claims are DISMISSED WITHOUT PREJUDICE. The Defendant Directors'

---

**6.** Some courts have applied section 12(2) to aftermarket transactions where the circumstances surrounding the transaction are similar to an initial offering. See Fujisawa 814 F.Supp. at 730 (allowing a section 12(2) claim to go forward where the seller was a corporate insider who exercised control of the corporation and was dealing directly with the

purchaser); Hedden v. Marinelli, 796 F.Supp. 432 (N.D.Cal.1992) (aftermarket sale of stock by a corporate insider with control of the corporation may be an exceptional case that warrants application of section 12(2)). However, even under this standard, Plaintiffs could not qualify.

motion on other grounds is, therefore, MOOT.

IT IS FURTHER ORDERED that Verity's motion to dismiss Plaintiff's claims under KRS § 292.480 are SUSTAINED and these claims against Verity are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Verity's motion to dismiss Plaintiffs' claims under KRS § 292.320 is SUSTAINED IN PART and DENIED IN PART. All claims against Verity are dismissed with prejudice except those arising from Verity official's comments to Jason Maynard on or about December 7, 1999.