RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0198p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ASHLAND, INC.; ASHTHREE LLC,[*]
                    *Plaintiffs-Appellants,*

      *v.*

OPPENHEIMER & CO., INC.,
                    *Defendant-Appellee.*

No. 10-5305

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 09-00135—Jennifer B. Coffman, Chief District Judge.

Argued: June 10, 2011

Decided and Filed: July 28, 2011

Before: KEITH, CLAY, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Christopher P. Johnson, KASOWITZ, BENSON, TORRES & FRIEDMAN LLP, New York, New York, for Appellants. Rodney Acker, FULBRIGHT & JAWORSKI L.L.P., Dallas, Texas, for Appellee. **ON BRIEF:** Christopher P. Johnson, Joshua Moses Greenblatt, KASOWITZ, BENSON, TORRES & FRIEDMAN LLP, New York, New York, Barbara B. Edelman, Grahmn N. Morgan, DINSMORE & SHOHL LLP, Lexington, Kentucky, for Appellants. Rodney Acker, Peter Stokes, FULBRIGHT & JAWORSKI L.L.P., Dallas, Texas, Lionel G. Hest, FULBRIGHT & JAWORSKI L.L.P., New York, New York, Douglass C. Farnsley, Clark C. Johnson, STITES & HARBISON PLLC, Louisville, Kentucky, for Appellee.

_____

[*] AshThree LLC is a special purpose entity wholly owned and operated by Ashland, Inc.

1

—————————

**OPINION**

—————————

COOK, Circuit Judge.   The plaintiff, Ashland Inc. ("Ashland"), appeals the district court's dismissal of its amended complaint against Oppenheimer & Co., Inc. ("Oppenheimer") in this securities-fraud action.  We affirm the district court's decision.

I.  Background

Ashland is a diversified global chemical company headquartered in Kentucky. Oppenheimer is a securities broker-dealer headquartered in New York.  This suit arises from Ashland's purchase of Oppenheimer-brokered auction rate securities ("ARS") in 2007 and 2008.

ARS are long-term bonds whose interest rates periodically reset through recurring auctions—commonly held every seven, fourteen, twenty-eight, or thirty-five days.   ARS typically offer higher returns than treasuries or other money market instruments, but with little additional credit risk.  Moreover, investors can liquidate their positions at each auction—*assuming demand exceeds supply*.   If, however, sellers outnumber buyers at a particular auction, the auction "fails," and *no* ARS owner may sell his position.  Though they have no obligation to do so, ARS underwriters (generally investment banks) may partake in the auctions, placing proprietary bids, to help ensure that the auctions do not fail.  As an additional safeguard, if an ARS auction fails, the securities will offer a "penalty" interest rate meant to compensate owners for temporary illiquidity and entice new buyers to emerge.  The penalty rate offered varies from security to security, but is generally specified in each security's offering document.

Following a capital divestiture in 2005, Ashland sought to invest approximately $1.3 billion while it searched for acquisition targets.  During May 2007, Joseph Broce, Ashland's Assistant Treasurer, met with Sherri Castner, Oppenheimer's Executive Director of Investments, to discuss the matter.  Castner advocated that Ashland buy ARS. Touting ARS' strong credit ratings, Castner represented them as "safe and liquid"

investments, "comparable to money market instruments." "[I]nstances of 'disequilibrium' in the ARS market were very rare," she said, because underwriters "had never allowed an auction to fail and would continue to act to prevent such an occurrence." Ashland heeded Castner's advice and purchased Oppenheimer-brokered, municipal-bond-backed ARS.

In mid-2007, Broce became worried about the subprime-mortgage crisis's effect on the securities and asked Castner what other investments Ashland might consider. Castner recommended that he look at student-loan-backed ARS ("SLARS"), which she claimed offered the same benefits as municipal ARS, but "were not connected to the market for subprime mortgages." Ashland thus started purchasing SLARS in lieu of tax-exempt ARS.

In January 2008, Ashland learned that Goldman Sachs, an underwriter for several SLARS deals, allowed one of its auctions to fail. Broce, concerned about the event, contacted Castner; she characterized the failure as an "aberration" and told Broce that SLARS remained "safe, liquid[,] and suitable investments" with "strong investor demand." But later that month, Lehman Brothers also let some of its ARS auctions fail. Shortly thereafter, Piper Jaffray followed suit. In the days surrounding these auctions, Oppenheimer continued marketing SLARS to Ashland, but "made absolutely no mention of the substantial systemic dangers in the ARS market," leading Ashland to hold and expand its SLARS portfolio.

Ashland purchased its last SLARS in early February 2008. Four days later, Oppenheimer's CEO called a meeting with company executives "to discuss the ARS market." The CEO later testified that, "at the end of this meeting, Oppenheimer had concluded that there were particular problems concerning SLARS." The market imploded the next day. Following this event, Broce told Castner to sell Ashland's SLARS, but neither Oppenheimer nor any underwriters would place proprietary bids, leaving Ashland with $194 million in illiquid SLARS. Ashland, unable to sell most of these holdings, discounted them by millions of dollars and lost similar amounts in the few sales it did execute. Moreover, when Ashland finally encountered an acquisition

opportunity—the entire reason it sought a liquid investment—it had to borrow funds and incurred millions of dollars in financing costs.

Ashland now alleges that, contrary to Oppenheimer's CEO's statements, Oppenheimer actually knew about the ARS meltdown months in advance. As support for its allegation, Ashland points to several occurrences. First, "beginning no later than August 2007, [Oppenheimer's CEO] received a hand[-]delivered memo each day documenting the status of failed ARS auctions." Second, Oppenheimer's CEO and an Oppenheimer Vice President, "aware of the spate of auction failures in the ARS market," sold some of their ARS holdings—$2.65 million and $100,000, respectively—between December 2007 and early February 2008. Then, in January 2008, another Oppenheimer Senior Vice President emailed company executives, cautioning that *if* a lead underwriter were "to quickly exit the [ARS] business entirely," the firm would have to find a replacement to process orders. If there were no replacements, however, Oppenheimer "[might] not be able to sell shares." Finally, in November 2008, the Massachusetts Office of the Secretary of the Commonwealth filed an administrative complaint against Oppenheimer. In conversations with these officials, an Oppenheimer Vice President retrospectively commented that "downgrades in monoline insurers were causing increasing[ly] noticeable stress on the ARS market by late 2007."

In addition to this central claim, Ashland's complaint lists several other facts about the securities that Oppenheimer allegedly withheld. For example, Oppenheimer never provided offering documents for ARS issuances until *after* Ashland purchased the instruments.[1] Nor did Oppenheimer disclose the ARS' true liquidity risks, including their lack of organic demand and the degree to which underwriters supported the auction market. Similarly, Oppenheimer failed to warn Ashland that underwriters "were not committed to ensuring liquidity" for ARS and SLARS, and would only place bids when

---

[1]Note, however, that Ashland *could* (and indeed did) access Oppenheimer's online ARS Brochure. The brochure clearly warns that "[b]efore investing in any ARS, investors should read and understand the relevant offering documents, including the information that they provide regarding all the risks and special considerations that may apply." Ashland does *not* allege that it ever requested the ARS' offering documents prior to auction, or that Oppenheimer would have denied Ashland's requests, had it done so.

it served their "own commercial best interests." Moreover, in promoting the ARS' AAA credit ratings, Oppenheimer never mentioned that they "were . . . achieved only because" of the securities' low penalty rates, which made the bonds harder for buyers to resell.[2] Finally, Oppenheimer never disclosed its sales commission structures, including that employees lost commissions if clients resold their ARS before a "minimum holding period" had passed.

In April 2009, Ashland sued Oppenheimer in the Eastern District of Kentucky, asserting five claims: (1) violation of the Securities and Exchange Act of 1934, (2) violation of Kentucky Blue Sky Laws, (3) common-law fraud, (4) promissory estoppel, and (5) negligent misrepresentation. Oppenheimer moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court heard oral argument on the motion before dismissing the case with prejudice in early 2010. In its memorandum opinion, the court explained that Ashland's securities-fraud claims did not allege "facts or scienter with the requisite particularity," *Ashland Inc. v. Oppenheimer & Co.*, 689 F. Supp. 2d 874, 889 (E.D. Ky. 2010), and that its common-law allegations failed to state a claim, *id*. at 889–91. Ashland appeals the ruling.

## II. Analysis

### A. Applicable Legal Standards

We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6). *Bowman v. United States*, 564 F.3d 765, 769 (6th Cir. 2008). In conducting this review, we "construe the complaint in the light most favorable to the plaintiff" and "accept all well-pleaded factual allegations as true." *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 477–78 (6th Cir. 2010). "In addition to the allegations in the complaint, [we] may also consider other materials that are integral to the complaint,

---

[2] Ashland emphasizes that Oppenheimer's online ARS Brochure does not specify these penalty rates, and that Oppenheimer did not directly disclose the rates to Ashland until Ashland explicitly requested them in February 2008. Again, though, the brochure explains where to obtain this information: "[Auction] [p]rocedures contained in the relevant offering documents . . . of specific ARS may vary from security to security. Accordingly, investors should read and understand the offering documents before investing in any ARS. . . . The method by which maximum and minimum rates are calculated typically is specified in the offering documents of the security. Not all maximum and minimum rates are calculated identically."

are public records, or are otherwise appropriate for the taking of judicial notice." *Ley v. Visteon Corp.*, 543 F.3d 801, 805 (6th Cir. 2008) (internal quotation marks and citation omitted), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323–25 (2011), *as recognized in Frank v. Dana Corp.*, — F.3d —, No. 09-4233, 2011 WL 2020717, at *5 (6th Cir. May 25, 2011).

Under Federal Rule of Civil Procedure 8(a)'s pleading standard, a plaintiff must provide "a short and plain statement of the claim showing that [he] is entitled to relief." Yet the complaint must include more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and instead proffer "enough facts to state a claim to relief that is plausible on its face," *id*. at 570. Regarding culpability, the complaint must allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged"; this entails showing "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). If a complaint pleads facts "that are merely consistent with a defendant's liability," it falls short of this requirement. *Id*. (internal quotation marks and citation omitted).

B.  Federal Securities-Law Claim

Ashland first alleges that Oppenheimer violated Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. "To state a securities fraud claim under Section 10(b), a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Frank v. Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008) (internal quotation marks and citation omitted). Moreover, "a misrepresentation or omission must pertain to material information that the defendant *had a duty to disclose*." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005) (emphasis added). "Misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available."

*In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997) (internal quotation marks and citation omitted).

Contrary to Ashland's allegations, many of Oppenheimer's purported misstatements and omissions are not actionable, either because they lacked materiality or because Oppenheimer had no duty to disclose them. For example, Ashland asserts it did not know that Oppenheimer's brokers received commissions only when clients bought and held ARS, a compensation structure that might place brokers' and investors' interests at odds. But "[t]here is no duty [for a company] to disclose the incentives that [it] provides its own employees to encourage those employees to sell specific products." *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 533 (S.D.N.Y. 2008); *see also In re UBS Auction Rate Sec. Litig.*, No. 08-CV-2967, 2010 WL 2541166, at *20 (S.D.N.Y. June 10, 2010) (collecting cases). Still other alleged omissions—such as the correlation between ARS' credit ratings and low penalty rates—consist of public information and constitute mere "statements about financial causation and about the way various elements of the securities markets interact." *See Ashland Inc. v. Morgan Stanley & Co.*, 700 F. Supp. 2d 453, 470 (S.D.N.Y. 2010). Finally, some of the alleged misstatements are too vague to qualify as material. For example, Ashland claims that Castner misrepresented the ARS as safe and secure, but such a "soft" description escapes "objective verification." *See In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004).

Recognizing that many of the purported misrepresentations and omissions that Ashland denounces lack Rule 10b-5 actionability, we look past these allegations and focus instead on its central claim: Oppenheimer peddled ARS to Ashland as liquid, short-term investments, all while withholding a crucial factor about the market—that its continued health depended upon the intervention of underwriters, many of whom were abandoning ARS auctions. We assume that disclosure of this fact would "significantly alter[] the total mix" of available information about ARS, *see In re Sofamor Danek Grp., Inc.*, 123 F.3d at 400, satisfying the materiality requirement, and therefore proceed to the issue of scienter.

In the securities-fraud context, the Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes "[e]xacting pleading requirements for pleading scienter," *Frank*, 547 F.3d at 570 (alteration in original) (internal quotation marks and citation omitted), which we define as "knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness," *see Ley*, 543 F.3d at 809.[3]  Under the PSLRA, plaintiffs "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Additionally, plaintiffs "shall, with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2).  "To qualify as 'strong'. . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  In examining scienter, we must decide whether all of the facts alleged, *taken collectively*, meet the PSLRA's requirements.  *Id*. at 322–23.

In *Helwig v. Vencor, Inc.*, we laid out a non-exhaustive list of factors we deemed probative of scienter in securities-fraud cases.  251 F.3d 540, 552 (6th Cir. 2001), *abrogated on other grounds by Tellabs, Inc.*, 551 U.S. at 323–24, *as recognized in Frank*, 547 F.3d at 571.  The district court accordingly walked through the list step-by-step when considering Ashland's complaint.  *See Ashland Inc. v. Oppenheimer & Co.*, 689 F. Supp. 2d at 886–88.  The Supreme Court, however, has recently emphasized that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  *Tellabs, Inc.*, 551 U.S. at 326; *accord Matrixx Initiatives, Inc.* 131 S. Ct. at 1324–25 (specifically endorsing, then engaging in, *Tellabs*'s holistic scienter examination).  Following the Supreme Court's lead, our court eschewed

---

[3]"Recklessness is defined as highly unreasonable conduct which is an extreme departure from the standards of ordinary care.  While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it."  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004) (internal quotation marks and citation omitted), *abrogated on other grounds by Matrixx Initiatives, Inc.*, 131 S. Ct. at 1323–25, *as recognized in Frank*, 2011 WL 2020717, at *5.

*Helwig*'s checklist approach in favor of *Tellabs*'s and *Matrixx*'s entirely collective assessment. *See Frank*, 2011 WL 2020717, at *5 ("In the past, we have conducted our scienter analysis in section 10(b) cases by sorting through each allegation individually before concluding with a collective approach. However, we decline to follow that approach in light of the Supreme Court's recent decision in [*Matrixx*]." (internal citations omitted)).

In accordance with this new precedent, we forgo the itemized claim analysis conducted by the district court and conclude that Ashland's factual allegations, when considered together, do not give rise to a strong inference that Oppenheimer acted with scienter. Simply put, apart from conclusory allegations, Ashland fails to provide *any* facts explaining why or how Oppenheimer possessed advance, non-public knowledge that underwriters would jointly exit the ARS market and cause its collapse in February 2008—thereby exposing Oppenheimer's "deliberate intent to manipulate, deceive, or defraud." *See Ley*, 543 F.3d at 809. Nor does Ashland argue that the hazard facing the ARS market was one "that any reasonable man would have known of." *See PR Diamonds, Inc.*, 364 F.3d at 681. At best, the alleged facts suggest that a few Oppenheimer employees were aware of what might happen *if the underwriters left the ARS market*, a seemingly remote risk, given its past stability. *See Vining v. Oppenheimer Holdings Inc.*, No. 08-CV-4435, 2010 WL 3825722, at *9 (S.D.N.Y. Sept. 29, 2010) ("The ARS market had allegedly existed for over twenty years with auction dealers following uniform policies of placing support bids in auctions as necessary to prevent auction failures. Simply knowing what would happen if those policies changed does not equate with knowing that they would change." (internal quotation marks and citation omitted)). But under the PSLRA, we need such detail if we are to credit Ashland's otherwise unfounded assertion that the "liquidity problems in the ARS market were already well known to Oppenheimer." In essence, Ashland fails to state sufficient "facts on which [its] belief is formed." *See* 15 U.S.C. § 78u-4(b)(1).

While the existence of scienter is *possible* in this case, the more compelling explanation is that the near-spontaneous collapse of the ARS market caught

Oppenheimer and its employees off guard. And though Oppenheimer may have "engaged in bad (in hindsight) business judgments in connection with ARS," *see In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009), or may have been "negligent in not detecting and disclosing the imminent market collapse," *see Vining*, 2010 WL 3825722, at *13–14, such actions fall short of scienter in the context of securities fraud, *see, e.g.*, *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999).

Our survey of the ARS-related litigation landscape affirms our position. Since the ARS fallout in early 2008, dozens of plaintiffs have sued both investment banks and broker-dealers for purportedly covering up problems in the market. In the few fraudulent-misrepresentation cases surviving motions to dismiss, the plaintiffs sufficiently explained *why or how* the defendants knew about the ARS market's impending illiquidity. *See, e.g.*, *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09-MD-2030, 2011 WL 1330847, at *2 (S.D.N.Y. Mar. 30, 2011) (noting that defendants, as ARS auction managers, "had exclusive access to supply and demand information and knew that the ARS market was teetering beginning in early 2007"). Other viable complaints alleged market manipulation—for example, that defendants propped up a languishing ARS market in order to unload inventories on unsuspecting clients. *See, e.g.*, *Dow Corning Corp. v. BB&T Corp.*, No. 09-5637, 2010 WL 4860354, at *10 (D.N.J. Nov. 23, 2010); *Defer LP v. Raymond James Fin., Inc.*, No. 08-CV-3449, 2010 WL 3452387, at *5 (S.D.N.Y. Sept. 2, 2010). Conversely, among those cases involving only vague allegations that market participants knew of, yet failed to disclose, risks surrounding the ARS market, the courts have readily granted defendants' Rule 12(b)(6) motions. *See, e.g.*, *Oughtred v. E*Trade Fin. Corp.*, No. 08-CV-3295, 2011 WL 1210198, at *1 (S.D.N.Y. Mar. 31, 2011) (dismissing, for an inadequate showing of scienter, complaint alleging that defendant "defrauded purchasers of auction rate securities by making misrepresentations and omissions of material fact about the risks, value, and liquidity of those securities"); *Ashland Inc. v. Morgan Stanley & Co.*, 700 F. Supp. 2d at 468–69 (same). The distinctions among these decisions reinforce our

conclusion that Ashland has insufficiently alleged scienter, and we thus affirm the district court's dismissal of its 10b-5 claim.

## C.  Kentucky Securities-Law Claim

Ashland next alleges that Oppenheimer violated Kentucky's Blue Sky Laws, specifically Ky. Rev. Stat. Ann. §§ 292.320, 292.480, which mirror 17 C.F.R. § 240.10b-5 and 15 U.S.C. § 77*l*(a), respectively.  *See Booth v. Verity, Inc.*, 124 F. Supp. 2d 452, 459–63 (W.D. Ky. 2000).  Although a private party pleading a violation of Section 292.320 may recover only under Section 292.480, he may also plead a separate cause of action under Section 292.480 directly.  *See, e.g.*, *Republic Bank & Trust Co. v. Bear, Stearns & Co.*, 707 F. Supp. 2d 702, 714–16 (W.D. Ky. 2010).  Whereas Ashland cites both provisions in its complaint, its appellate filings mention—and fleetingly at that—only "Section 10(b) claims."  We interpret this opaque language to reference only its Section 292.320 claim, thus forfeiting any independent cause of action under Section 292.480.  *See United States v. Sandridge*, 385 F.3d 1032, 1035 (6th Cir. 2004) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

As the district court noted, Section 292.320 is "virtually identical" to its federal counterpart.  *Ashland Inc. v. Oppenheimer & Co.*, 689 F. Supp. 2d at 889; *see also Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 916–17 nn.10–11 (6th Cir. 2007) (comparing statutory language).  Under this provision, a plaintiff must consequently allege the same elements as under Rule 10b-5, *Republic Bank & Trust Co.*, 707 F. Supp. 2d at 714, again subject to the PSLRA's heightened pleading standards, *Booth*, 124 F. Supp. 2d at 459–61.  As such, our prior Rule 10b-5 analysis applies equally to Ashland's Section 292.320 claim, and we affirm the district court's dismissal.

## D.  Common-Law Fraud Claim

Complementing its securities-fraud claims, Ashland also alleges that Oppenheimer's actions constituted fraud under Kentucky's common law.  To prevail on a claim of common-law fraud, a plaintiff must establish, by clear and convincing

evidence, the following six elements:   (1) that the declarant made a material misrepresentation to the plaintiff, (2) that this misrepresentation was false, (3) that the declarant knew it was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff.  *See, e.g.*, *Clayton v. Heartland Res., Inc.*, 754 F. Supp. 2d 884, 899 (W.D. Ky. 2010); *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 262 (Ky. Ct. App. 2007).

We recognize, as Ashland emphasizes in its brief, that its common-law fraud claim need not meet the PSLRA's heightened pleading requirements.   It must nonetheless fulfill Federal Rule of Civil Procedure 9(b)'s particularity requirements, *see Frank*, 547 F.3d at 569–70, as well as Rule 8(a)'s general guidelines.  As we explained earlier though, Ashland has not alleged facts showing that Oppenheimer acted with "knowing and deliberate intent to manipulate, deceive, or defraud" or "recklessness" in support of its assertions to this effect.  *See Ley*, 543 F.3d at 809; *see also Twombly*, 550 U.S. at 555 n.3 ("Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief.").   We accordingly affirm the district court's dismissal of Ashland's common-law fraud claim.

E.  Promissory-Estoppel Claim

As its fourth claim, Ashland asserts that we must force Oppenheimer to fulfill the promises it made in connection with Ashland's ARS purchases.  Under Kentucky law, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."  *McCarthy v. Louisville Cartage Co.*, 796 S.W.2d 10, 11–12 (Ky. Ct. App. 1990) (citation omitted) (adopting and applying Restatement (Second) of Contracts § 90 (1981)).  Although some states also require that the promisee's reliance be reasonable, *see, e.g.*, *Rigby v. Fallsway Equip. Co.*, 779 N.E.2d 1056, 1061 (Ohio Ct. App. 2002), Kentucky law is unsettled on this issue, *see, e.g.*, *TWB Distrib., LLC v. BBL, Inc.*, Civil Action No. 3:08-CV-509-5, 2009 WL 5103604, at *5–6 (W.D. Ky. Dec. 17, 2009)

(collecting cases). In any instance, the reasonableness of the promisee's reliance "warrants significant consideration in deciding whether enforcement of a promise is necessary to avoid injustice." *Id.* at *6; *see also* Restatement (Second) of Contracts § 90 cmt. b (1981) ("[E]nforcement must be necessary to avoid injustice. Satisfaction of [this] requirement may depend on the reasonableness of the promisee's reliance . . . .").

Ashland alleges that Oppenheimer promised (1) that the ARS were "safe and liquid," (2) that Oppenheimer and the lead underwriters "would ensure the liquidity of" these ARS, and (3) that Oppenheimer and the lead underwriters "had the intent and ability to never allow Ashland to be left holding illiquid" ARS. None of these "promises" justifies estoppel.

Despite Ashland's labeling, Oppenheimer's descriptions about ARS' safety and liquidity do not qualify as promises, since these vague statements do not implicate any commitment on Oppenheimer's part. *See* Restatement (Second) of Contracts § 2(1) (1981) ("A promise is a manifestation of intention to act or refrain from acting in a specified way . . . ."). Dispelling this first claim leaves us with Oppenheimer's promises to guarantee the ARS' liquidity—promises we do not believe must be enforced in order to avoid injustice. Ashland admits to reading Oppenheimer's online ARS Brochure; in that document, Oppenheimer explicitly warned that it "is not obligated to submit a bid to prevent an auction failure," and "provides no assurance . . . as to the outcome of any auction." Thus, the promises upon which Ashland allegedly relied directly contradict the explicit terms of Oppenheimer's ARS Brochure. Moreover, Oppenheimer repeated similar admonitions in each of the offering statements that accompanied its ARS sales. Ashland claims to have lacked these offering statements at the time of its purchases, but the ARS Brochure, which Ashland possessed, instructs investors to "read and understand the relevant offering documents" before purchasing ARS.

The Second Circuit, when confronting a similar scenario, held that "[a]n investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993); *accord Starr ex rel. Estate of Sampson v. Georgeson*

*S'holder, Inc.*, 412 F.3d 103, 109–10 (2d Cir. 2005).  Moreover, in Ashland's sister suit against the ARS' underwriters, the Southern District of New York chided that "it was unreasonable, perhaps reckless, for [Ashland] to not insist upon receiving, in writing, the [offering documents] . . . before making its initial investment." *Ashland Inc. v. Morgan Stanley & Co.*, 700 F. Supp. 2d at 471.  We agree.  Given Oppenheimer's warning to Ashland that it should read and understand the ARS offering statements before purchasing the securities, its failure to do so renders any reliance upon Oppenheimer's vague oral assurances unreasonable.  We thus conclude that Ashland has not shown why "injustice can be avoided only by enforcement of the[se] promise[s]," *see* Restatement (Second) of Contracts § 90(1) (1981), and affirm the district court's decision dismissing Ashland's promissory-estoppel claim.

F.  Negligent-Misrepresentation Claim

    Finally, Ashland alleges that Oppenheimer negligently misrepresented its ARS. Under Kentucky law, to plead negligent misrepresentation, Ashland must allege facts showing that (1) Oppenheimer, in the course of its business or in a transaction in which it had a pecuniary interest, failed to exercise reasonable care or competence, and thereby supplied false information for the guidance of Ashland's business transactions; (2) Ashland justifiably relied on this information; and (3) Ashland suffered a pecuniary loss. *See Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 580–82 (Ky. 2004).  "Like the cause of action for fraud, moreover, a negligent misrepresentation claim requires proof of an actionable misrepresentation, i.e. 'false information,'" and "allegations concerning . . . mere opinions and predictions cannot be deemed to meet that requirement." *Flegles, Inc. v. Truserv Corp.*, 289 S.W.3d 544, 553–54 (Ky. 2009).

    We need not belabor our analysis of Ashland's final claim, which fails for much the same reason as its promissory-estoppel claim.  Namely, Ashland does not allege facts showing that it justifiably relied on Oppenheimer's ambiguous representations, particularly in light of the numerous warnings contained in Oppenheimer's online ARS Brochure, as well as in the ARS' offering documents to which Ashland was directed. And, as a secondary matter, Ashland failed to allege facts indicating that Oppenheimer

supplied false information about ARS' liquidity—i.e., facts demonstrating that the securities were actually illiquid between July 2007 and early February 2008, the period during which Ashland made its purchases. *See Ashland Inc. v. Oppenheimer & Co.*, 689 F. Supp. 2d at 890. In fact, Ashland's assertion that Oppenheimer executives sold large sums of personal ARS holdings through early February 2008 implies just the opposite—that the market remained liquid right up until its collapse. We accordingly affirm the district court's decision to dismiss Ashland's negligent-misrepresentation claim.

## III. Conclusion

For the foregoing reasons, we affirm the district court's order dismissing Ashland's complaint with prejudice.