RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0410p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

HOWARD FRANK, Individually and On Behalf of All
Others Similarly Situated,

*Plaintiff,*

PLUMBERS & PIPEFITTERS NATIONAL PENSION
FUND; SEIU PENSION PLANS MASTER TRUST, and
WEST VIRGINIA LABORERS PENSION TRUST FUND,
on Behalf of Themselves and All Others Similarly
Situated,

*Plaintiffs-Appellants,*

*v.*

DANA CORPORATION,

*Defendant,*

MICHAEL J. BURNS and ROBERT C. RICHTER,

*Defendants-Appellees.*

No. 07-4235

>

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 05-07393—James G. Carr, Chief District Judge.

Argued: October 30, 2008

Decided and Filed: November 19, 2008

Before: CLAY, GILMAN, and ROGERS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Joseph D. Daley, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS, San
Diego, California, for Appellants. Joel W. Sternman, KATTEN MUCHIN ROSENMAN, New
York, New York, for Appellees. **ON BRIEF:** Joseph D. Daley, COUGHLIN, STOIA, GELLER,
RUDMAN & ROBBINS, San Diego, California, for Appellants. Joel W. Sternman, Anthony L.
Paccione, KATTEN MUCHIN ROSENMAN, New York, New York, for Appellees.

1

———————————

## OPINION

———————————

CLAY, Circuit Judge.  Plaintiffs-appellants represent a class of investors who purchased securities of Dana Corporation ("Dana") between April 21, 2004 and October 7, 2005 (the "Class Period").  Plaintiffs' class-action complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5.  In particular, Plaintiffs allege that the Defendants, two of Dana's chief corporate officers during the Class Period, are responsible for a number of intentional or reckless misstatements and material omissions which Plaintiffs allege were calculated to artificially boost Dana's stock price.

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court dismissed the complaint for failure to satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), finding that the complaint failed to assert allegations that could support a "strong inference" that Defendants acted with the requisite scienter. *Frank v. Dana Corp.*, 525 F. Supp. 2d 922, 932 (N.D. Ohio 2007).  In articulating the controlling pleading standard, the district court stated that it was "required to accept plaintiff's inferences of scienter only if those inferences are the *most plausible* of competing inferences." *Id.* at 930 (emphasis added).  Because this formulation of the applicable pleading standard is contrary to the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, ___ U.S. ___, 127 S. Ct. 2499 (2007), which held that a complaint will survive a motion to dismiss so long as "a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged," *id.* at 2510 (emphasis added), we vacate the judgment of the district court.

I.

Dana is a supplier of automotive parts and drive-train systems for light, commercial, and off-highway vehicle manufacturers.  Sales to three customers—General Motors, Ford, and DaimlerChrysler—accounted for nearly half of Dana's sales during the Class Period.  The Defendants are Michael J. Burns and Robert C. Richter, Dana's Chief Executive Officer and Chief Financial Officer, respectively, during the Class Period.  Dana is no longer a party to this action, having filed for bankruptcy protection.

Based on a series of positive financial statements, the value of Dana's stock steadily increased over the Class Period, until Dana quickly fell into financial ruin in October of 2005.  Following Dana's collapse, Plaintiffs filed this action, alleging that Burns and Richter misled and deceived investors by reporting strong earnings, declaring positive financial outlooks, and touting sound internal accounting procedures when in fact none of these were true.  For each of the financial quarters during the Class Period, Defendants signed Dana's SEC filings, issued press releases and participated in conference calls announcing the company's quarterly earnings, and signed the company's Sarbanes-Oxley § 302 certificates.[1]  Plaintiffs also allege that the Defendants misled investors by repeatedly assuring the public that Dana had instituted improved accounting controls, when in fact Dana's accounting systems and procedures were plagued with material weaknesses.

On July 21, 2004, Dana reported $0.72 second quarter earnings per share ("EPS"), more than double Dana's EPS over the same period in 2003.  In announcing these earnings, Dana projected

———————————

[1]Pursuant to 15 U.S.C. § 7241, Dana's Sarbanes-Oxley certifications stated that the financial report being certified "does not contain any untrue statement of material fact," and that each of the financial statements "fairly present in all material respects" the company's financial condition during the reporting period.

EPS of $1.90 per share for fiscal year 2004.  Despite the notable rise in the price of steel and other raw materials, Defendants stated that Dana expected continued growth, assuring investors that the company's cost reduction initiatives would offset rising production costs.

On October 12, 2004, however, Dana was forced to lower its projected 2004 EPS to $1.60 to $1.65 per share, noting rising raw material costs as a key factor.  Despite these pressures, Defendants continued to project positive growth for 2005.  Shortly thereafter, on October 20, 2004, Dana reported solid third quarter figures, including a near 40% jump in net profits over the same period in 2003.  In announcing the third quarter figures, Defendants again assured investors that Dana could offset rising costs by, among other things, "accelerat[ing] deployment of lean manufacturing techniques" and "standardiz[ing] . . . administrative processes throughout the company."

On February 23, 2005, Dana again announced positive quarterly results, reporting increased fourth quarter sales and earnings over 2003.  Dana also reported net income of approximately $262 million for fiscal year 2004, up from $183 million for 2003.  In announcing these figures, Defendants reiterated Dana's positive financial outlook, projecting earnings of $0.17 to $0.23 per share for the first quarter of 2005 and $1.40 to $1.62 per share for 2005.

In March of 2005, Dana again was forced to temper its earnings projections, reducing its EPS forecast for both the first quarter of 2005 and fiscal year 2005.  In April of 2005, Dana reported earnings below even its reduced estimate.  In announcing these figures, Defendants again attempted to reassure investors that the dip in earnings was the result of temporary production issues that had been resolved.  Despite rising costs and slowing production, Dana reiterated its March 2005 earnings estimate of $1.30 to $1.45 per share for 2005.

On July 20, 2005, Dana issued its earnings figures for the second quarter of 2005, reporting a staggering 275% increase over the preceding quarter.  In announcing the results, Defendants claimed that the company made "substantial profit improvement" by focusing on "lean manufacturing and value engineering programs" that yielded "tangible results."  Despite the increased earnings, Dana maintained its tempered $1.30 to $1.45 earnings projections for 2005.

On September 15, 2005, Defendants announced that Dana was reducing its prior EPS projections by half based on rising steel prices and Dana's inability to offset the increase in production costs.  Defendants also announced that Dana would likely restate its financial results for the second quarter of 2005, and that the company may have to write down its deferred tax assets.  As a result of this news, Dana's shares fell 20% in a single day, with Dana's stock continuing to fall over the following days as the market absorbed the news.

Just over three weeks later, on October 10, 2005, Dana announced that its financial statements for all of 2004 and the first half of 2005 "should no longer be relied upon," and that Dana intended to restate its financial positions for those periods.  Despite prior assurances regarding its internal accounting policies and controls, Dana also reported that it had uncovered "material weaknesses in its internal control over financial reporting."  The market reaction was swift and unkind, as Dana's stock price dropped nearly 35% in a single day on record trading volume.

On December 30, 2005, Dana issued its restated earnings for the first two quarters of 2005, reducing its stated net income by $44 million.  On January 17, 2006, Dana announced a loss of $1.27 billion for the third quarter of 2005.  At the same time, Dana announced that it intended to write off nearly $1 billion of the company's assets, taking a "valuation allowance" that reduced its tax deferred assets by $918 million.

In February of 2006, the SEC announced a formal investigation into Dana's accounting practices.  That same month, Dana defaulted on $21 million of interest payments on its outstanding

debt.  Ultimately, Dana filed for bankruptcy on March 3, 2006.  Three days after the bankruptcy filing, Defendant Richter announced his retirement from the company.  Defendant Burns remains at Dana.

## II.

Purchasers of Dana securities initially filed suit on October 12, 2005.  After the district court appointed certain plaintiffs to serve as statutory lead plaintiffs and approved their choice of counsel, the lead plaintiffs filed a consolidated class-action complaint in this action.  Defendants moved to dismiss the complaint pursuant to Rules 8, 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure, as well as under the pleading requirements set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA").  After briefing and oral argument, the district court granted Defendants' motion and dismissed the complaint.  *Frank*, 525 F. Supp. 2d at 933.  Judgment was entered on August 21, 2007.

## III.

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder prohibit "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security."  *Morse v. McWhorter*, 290 F.3d 795, 798 (6th Cir. 2002).  To state a securities fraud claim under Section 10(b), a plaintiff "must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury."  *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999).

Securities fraud claims arising under Section 10(b), as with any fraud claim, must satisfy the particularity pleading requirements of Rule 9(b).  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004).  Accordingly, Plaintiffs' complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Gupta v. Terra Nitrogen Corp.*, 10 F. Supp. 2d 879, 883 (N.D. Ohio 1998).  At a minimum, Plaintiffs must allege the time, place and contents of the misrepresentations upon which they relied.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984).

In addition, the PSLRA imposes additional and more "[e]xacting pleading requirements" for pleading scienter in a securities fraud case.  *Tellabs*, 127 S. Ct. at 2504.  Under the PSLRA's heightened pleading requirements, any private securities complaint alleging that the defendant made a false or misleading statement must:

> (1) . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed [and]

> (2) . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1), (2) (emphasis added).  In other words, the PSLRA "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate or defraud.'"  *Tellabs*, 127 S. Ct. at 2504 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)).

Although the PSLRA left the term undefined, the Supreme Court has concluded that Congress adopted the "strong inference" standard in order to raise the bar for pleading scienter.

*Tellabs*, 127 S. Ct. at 2509. In doing so, the PSLRA "implement[ed] procedural protections to discourage frivolous litigation." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 547 (6th Cir. 2001).

In *Tellabs*, the Supreme Court prescribed a specific three-step analysis that district courts are to follow in considering a motion to dismiss private securities claims arising under Section 10(b). First, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 127 S. Ct. at 2509. Second, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* (citation omitted). At the second stage, the relevant question "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (emphasis in original). The PSLRA does not permit a plaintiff merely "to allege facts from which an inference of scienter rationally *could* be drawn." *Id.* at 2510. Rather, the inference of scienter "must be cogent and compelling, thus strong in light of other explanations." *Id.*

Finally, in determining whether the pleaded facts give rise to a *strong* inference of scienter, "the court must take into account plausible opposing inferences." *Id.* at 2509. Because the strength of an inference "cannot be decided in a vacuum," the district court must conduct a "comparative inquiry" and assess the possible competing inferences that could be drawn from the allegations, including "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 2509-10.

In defining how this framework is to be applied, the Supreme Court expressly held that a complaint will survive a motion to dismiss so long as "a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* at 2510 (emphasis added). Thus, where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward. *See id.* at 2510 n.5; *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008) ("In other words, where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff.").

### IV.

It is this final aspect of *Tellabs* that we confront here.[2] In articulating the controlling pleading standard, the district court stated that it was "required to accept plaintiff's inferences of scienter only if those inferences are the *most plausible* of competing inferences." *Frank*, 525 F. Supp. 2d at 930 (emphasis added). The district court explained that, "under *Tellabs*, plaintiff must establish an inference of scienter that is *more plausible and powerful* than competing inferences of defendants' state of mind." *Id.* at 928 (emphasis added). This standard plainly is at odds with the Supreme Court's holding in *Tellabs* that inferences of scienter that are "at least as compelling" as competing nonculpable inferences are sufficient for the complaint to survive a motion to dismiss.

The district court's "most plausible" standard is derived from this Court's decision in *Helwig*, where the en banc Court held that "the 'strong inference' requirement means that plaintiffs are entitled only to the most plausible of competing inferences." 251 F.3d at 553. After *Tellabs*, however, the standard adopted in *Helwig* is no longer good law. 127 S. Ct. at 2510 (expressly

---

[2] Because we vacate on other grounds, we do not address whether the district court erred in entering judgment without considering Plaintiffs' informal request to amend the complaint.

rejecting the "most plausible of competing inferences" standard applied in *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004), and *Helwig*, 251 F.3d at 553).

## V.

Because the "most plausible" pleading standard applied by the district court is at odds with *Tellabs*, we hereby **VACATE** the judgment of the district court and **REMAND** the case to the district court to consider whether Plaintiffs have made allegations that support an inference of scienter that is "at least as compelling" as competing nonculpable inferences.