NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0076n.06

Case No. 16-1135

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| WILLIAM BEAUMONT HOSPITAL SYSTEM | ) | **FILED** |
|  | ) | Jan 26, 2017 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) |  |
|  | ) | ON APPEAL FROM THE |
| MORGAN STANLEY & CO., LLC and GOLDMAN | ) | UNITED STATES DISTRICT |
| SACHS & CO., | ) | COURT FOR THE EASTERN |
|  | ) | DISTRICT OF MICHIGAN |
| Defendants-Appellees. | ) |  |
|  | ) | **OPINION** |
|  | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

BEFORE: NORRIS, GIBBONS, and ROGERS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Plaintiff William Beaumont Hospital ("Beaumont") and defendants Morgan Stanley and Goldman Sachs entered into a structured-debt-issuance agreement for auction-rate securities ("ARS") in March 2006 to finance a hospital-renovation project.

Defendants, as underwriters for the debt, agreed to purchase and to make a public offering of the ARS. Pursuant to the agreement and related disclosures, defendants had a practice of submitting cover bids in the ARS market. In 2007, many ARS auctions failed as the economy slowly deteriorated leading up to the 2008 financial crisis. None of the ARS auctions

involving Beaumont's debt securities failed, but demand for Beaumont's ARS declined, and it was forced to pay investors higher interest rates than it had previously. Defendants then, consistent with their broker-dealer agreement, ceased making bids in Beaumont's ARS auctions.

On January 28, 2014, Beaumont filed suit in federal district court and also filed an arbitration action with the Financial Industry Regulatory Authority ("FINRA"). FINRA, and then the district court, held that the applicable Michigan six-year statute of limitations barred Beaumont's claims because the limitations period began running in March 2006 when the contract was signed and the debts were issued. Ruling in the alternative, the district court also dismissed Beaumont's claims on Rule 12(b)(6) grounds for failure to state a claim.

Beaumont appeals the dismissal of its claims, arguing that the statute of limitations did not begin to run until it suffered damages when the markets crashed in 2008. It also argues that the district court erred in granting defendants' 12(b)(6) motion. For the reasons that follow, we affirm the district court's dismissal of Beaumont's claims.

I.

William Beaumont Hospital ("Beaumont") is a Michigan nonprofit corporation that operates three hospitals in southeastern Michigan. In 2005, Beaumont began negotiations with Morgan Stanley & Co. and Goldman Sachs & Co. (collectively, "defendants") to finance renovations of one of its hospitals and for the construction of a new facility. Beaumont had worked previously with Morgan Stanley on its overall financing structure and with investment banker Bette Kraus, prior to her starting at Goldman Sachs.

Beginning in summer 2005, and continuing until the debt issuance in March 2006, Beaumont met with defendants and their representatives to negotiate the structuring of a financing deal. Beaumont looked to defendants to serve as underwriters and broker-dealers for

the issuance of auction-rate securities ("ARS"), which are long-term variable-rate bonds with interest rates that reset based on short-term "Dutch auctions." Interest rates are dependent on the sale of all of the ARS offered at a particular auction. ARS auctions are generally held every 7, 28, or 35 days, and broker-dealers "buy" and "sell" orders and then forward them to the designated auction agent that administers the auction. If bids received by the auction agent are insufficient to purchase all of the ARS offered for sale at a particular auction, the auction "fails" and all ARS holders within that auction are unable to sell their securities. At this point, the interest rate on all ARS associated with the failed auction jumps to the contractual maximum rate, as determined by the offering documents.

In June 2005, Beaumont's Board of Directors approved a resolution authorizing the hospital system to enter into swap transactions with defendants' affiliates in an amount not to exceed $600 million. The resolution was approved on the recommendation of defendants. After a December 2005 committee meeting discussing the available structures for the 2006 bond issuance, including "either . . . synthetic or traditional fixed rate basis," defendants advised Beaumont to issue its "new money bonds in 2006 on a synthetic fixed rate basis."

Defendants continued to "provide advice and recommendations as to the structure of the 2006 financing" through "regular in-person meetings, telephone calls, and email conversations" as the parties negotiated their deal over the next four months. However, Beaumont looked elsewhere for more objective financial advice on the ARS broker-dealer market and regarding their negotiations with defendants. Beaumont hired independent financial advisor, Kaufman Hall, "to provide advice regarding the swap and to serve as a consultant on the bond issuance."

In structuring the 2006 bond issuance, defendants advised Beaumont to use a fixed maximum rate of 12 percent. As detailed in the disclosures submitted to Beaumont by the

3

defendants, and as reiterated in Beaumont's own disclosures pursuant to the parties' agreement, defendants would place support "cover" bids in the ARS auctions in order to prevent failures in any auction in which they were lead broker-dealers. "Cover" bidding meant that defendants would purchase orders for "the entirety of an ARS issue for which they acted as the sole or lead broker-dealer" to prevent auction failure, which would result in increased costs to Beaumont.

The parties entered into a final agreement in March 2006, pursuant to which Beaumont issued $206.7 million in bonds, with $128.225 million as ARS combined with an interest-rate swap. After the 2006 bond issuance, defendants became the broker-dealers on the bonds and earned broker-dealer fees, equal to 25 basis points (approximately $320,000 annually). From 2006 to early 2008, Beaumont's ARS performed as predicted. Beaumont and defendants regularly communicated about the bond issuance, "in a concerted effort to maintain and strengthen the investment banks' relationships with the hospital system." The parties, using their established relationship, also negotiated other deals and worked on potential investment ventures entirely separate from the 2006 bond issuance.

By August 2007, as the financial market was headed toward a crash, a number of ARS auctions issued by corporations and closed-end funds, a different sector of the ARS market, failed. Banks began to limit inventory exposure to ARS and discuss "exit strategies" regarding the ARS market. During this time, defendants continued to manage Beaumont's ARS, "carefully monitoring their inventory and assessing the likelihood of auction failures in the ARS market" and "convening regular meetings to discuss the volatile ARS market." Based on the declining market, defendants had to increasingly "cover" bids in their ARS auctions.

Defendants met with Beaumont during 2007 to discuss the health of the ARS market, including a "Capital Markets Discussion" in August and a "Market Update Conference Call" in

November. Many of these meetings were part of the parties' dealings regarding separate business and investment ventures. In December 2007, the parties met to negotiate a deal based on a new type of financing created to capitalize on the market's increasing instability, and defendants noted to Beaumont that the ARS market remained volatile—something that was reported throughout the financial industry. Defendants continued to manage Beaumont's ARS pursuant to their 2006 agreement, which included within its disclosures that defendants could stop making support bids to cover the market.

The financial market continued to erode into early 2008. In February, ARS broker-dealers, including defendants, stopped submitting support bids in municipal ARS auctions, leading the ARS market into a downward spiral. While Beaumont's ARS auctions never failed, following the overall ARS-market crash, traditional ARS investors "fled the market," and demand for ARS decreased. Decreased demand meant Beaumont was left paying investors a higher fixed-interest rate.

Following the 2008 ARS-market crash, Beaumont alleged that, during their 2005 and 2006 negotiations, defendants fraudulently misrepresented the fundamental structure of the ARS market and withheld information about their support-bidding practices. This alleged fraud induced Beaumont to enter into the 2006 bond structure and pay defendants higher broker-dealer fees. Beaumont also alleges that in 2007 and early 2008 defendants withheld critical information regarding the vitality of the ARS market, causing Beaumont to suffer damages during the 2008 financial crash.

Beaumont filed suit against defendants on January 28, 2014. Simultaneously, Beaumont filed arbitration proceedings before FINRA. The district court stayed the case until the resolution of FINRA arbitration. FINRA dismissed Beaumont's claims, finding them ineligible

for arbitration on the grounds that the limitations period had run. Defendants then filed a Motion to Dismiss the Second Amended Complaint with the district court on April 24, 2015. Following a hearing on the motion, the district court dismissed Beaumont's claims on two independent grounds. First, the six-year Michigan statute of limitations had run on Beaumont's claims. Second, the court granted defendants' motion to dismiss on the basis of Rule 12(b)(6), finding that Beaumont failed to state a claim for relief. This appeal followed.

## II.

We review *de novo* a district court's dismissal of a complaint for failure to state a claim under Rule 12(b)(6). *Phil. Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013). We "constru[e] the record in the light most favorable to the non-moving party and accept[] all well-pled factual allegations as true" to determine whether the complaint, as pled, contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Republic Bank & Tr. Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 246–47 (6th Cir. 2012)). We may, however, "affirm on any grounds supported by the record, even though they may be different from the grounds relied on by the district court." *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 479 (6th Cir. 2010).

Fraud and misrepresentation claims are held to a higher pleading standard under Rule 9(b). Fed. R. Civ. P. 9(b). Rule 9(b) states that claims of fraud "must state with particularity the circumstances constituting [the] fraud," *id.*, which this circuit has interpreted to mean a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008); *see also Rautu v. U.S. Bank*, 557 F. App'x 411, 414 (6th Cir. 2014); *Ram Int'l, Inc. v. ADT Sec. Servs., Inc.*, 555 F.

App'x 493, 498 (6th Cir. 2014). Rule 9(b) applies with equal force to fraud claims premised on an omission or a failure to disclose. *See Republic Bank*, 683 F.3d at 255–56; *Gilmore v. First Am. Title Ins. Co.*, No. 07-12123, 2009 WL 2960703, at *3 (E.D. Mich. Sept. 11, 2009).

A.

Beaumont has failed to adequately plead a cause of action upon which relief could be granted and dismissal under Rule 12(b)(6) was proper. In order to successfully plead a claim of fraud or misrepresentation in Michigan, a plaintiff must allege:

> (1) that the defendant made a material representation, (2) that was false, (3) that the defendant knew was false, or that was made recklessly without any knowledge of its truth, (4) that the defendant made it with the intention that the plaintiff would act upon it, and (5) the plaintiff acted in reliance upon it, and (6) suffered damages.

*Fransworth v. Nationstar Mortg., LLC*, 569 F. App'x 421, 426–27 (6th Cir. 2014); *see also Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 815–16 (Mich. 1976).

Beaumont's claims are also subject to the heightened pleading standards for fraud and misrepresentation under Rule 9(b), which require a plaintiff to allege specific facts about alleged misrepresentations, including the statements made and by whom, when and where they were made, and to whom they were made. *See Frank*, 547 F.3d at 569–70. Vague allegations of generic misrepresentations or omissions are not sufficient to survive a Rule 12(b)(6) challenge. *See id.* "At a minimum, [p]laintiffs must allege the time, place and contents of the misrepresentations upon which they relied." *Id.* at 570 (citing *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984)).

None of Beaumont's claims of fraud and misrepresentation meet Rule 9's heightened pleading standard. Beaumont cites multiple instances of alleged fraud and misrepresentation within its two-count complaint, but they boil down to three chief issues with the 2006 financing

deal: (1) defendants withheld information about the structure of the ARS market and their support-bidding practices; (2) defendants misrepresented the availability of fixed-versus-formulaic rate structures in order to achieve a higher broker-dealer fee; and (3) defendants failed to warn Beaumont about the deteriorating ARS market in 2007 and 2008. Based on the information pled in Beaumont's complaint, each of these allegations of misrepresentation can easily be dismissed under Rules 12(b)(6) and 9(b).

First, the overarching theory of Beaumont's complaint is that, had defendants disclosed that they engaged in support-bidding practices in their ARS auctions and that they retained the discretion to stop placing cover bids as the ARS market required, it would not have signed the 2006 bond issuance as is. This argument fails, because as Beaumont itself acknowledged in its 2006 Official Statement regarding the bond issuance (affirming almost identical language provided to Beaumont by defendants):

> Broker-[d]ealers . . . routinely place[] one or more bids in auctions generally to prevent a failed auction or a clearing rate it believes is not a market rate. While they may do so with respect to the Bonds, they are not obligated to do so and may elect not to do so . . . . Broker-[d]ealers may submit Orders for their own accounts in an Auction in order to prevent the Auction from failing, [but] they are not obligated to do so, and there is no assurance that any one or more Auctions will not fail.

Beaumont also acknowledged in its statement that if "the number of Bonds offered for sale exceeds the number offered to be purchased in any Auction, the Auction will fail and beneficial owners may not be able to sell their Bonds at that time . . . . The relative buying and selling interest of market participants in Bonds, both within and outside of an Auction, will vary over time." This is exactly the information Beaumont alleges defendants withheld from it during their dealings leading up to the March 2006 issuance. Simply put, Beaumont's allegations of misrepresentation and fraud, in light of the specific disclosures in the record, are not actionable.

Without more specific allegations that would satisfy Rule 9(b)'s heightened pleadings, Beaumont's claims of fraudulent inducement fail.

Second, the claim that defendants withheld information about the availability of formula-based maximum interest rates and instead promoted a fixed-rate interest maximum for the 2006 bonds is, likewise, not actionable. Beaumont's complaint does not meet Rule 9(b) standards—all allegations regarding this claim involve vague accusations of fraud and misrepresentation rather than the specific, identifiable statements required by this circuit. *See Frank*, 547 F.3d at 569–70. Nowhere in its complaint does Beaumont allege any specific misstatement made at a certain time and place, including the "contents of the misrepresentation(s) upon which [it] relied." *Rautu*, 557 F. App'x at 414.

Third, although Beaumont relies solely on common-law theories of fraud and misrepresentation, it attempts with its claims to impose the duties of a financial advisor on defendants. This is misguided, and Beaumont's theory does not survive 12(b)(6) and 9(b) review. Again, Beaumont does not allege enough specific information about any misstatements or omissions to survive the heightened standard of Rule 9(b). Beaumont would need to provide the names of representatives who participated in the conversations and ran the presentations from which Beaumont's allegations of misrepresentation arise. Further, it appears that defendants *did* apprise Beaumont to the volatility in the ARS market. And this volatility was widely-known within the financial markets.

As a final point, Beaumont has also failed to establish that defendants had any ongoing duty to disclose information about the health of the ARS market. Without a duty to disclose, there can be no fraud by omission. And, in any event, the meetings during which defendants allegedly failed to disclose information about the ARS market were meetings unrelated to the

2006 bond issuance. Beaumont has failed to demonstrate that defendants fraudulently omitted any information pertaining to the ARS market or the 2006 bond issuance. Thus, we affirm the district court's dismissal on Rules 12(b)(6) and 9(b) grounds.

B.

The district court also dismissed Beaumont's claims because it found that the applicable statute of limitations had run, but because we affirm the district court on 12(b)(6) and 9(b) grounds, we need not address its ruling on the Michigan statute of limitations.

III.

For the reasons stated above, we affirm the judgment of the district court.