NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0543n.06

No. 19-1631

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>ANGELO IAFRATE, SR., individually and as trustee of the John Iafrate Irrevocable Trust u/a/d 1/1/98; DOMINIC IAFRATE; ANGELO E. IAFRATE,</td><td>)<br>)<br>)<br>)<br>)</td><td rowspan="2"></td></tr>
<tr><td style="text-align:center">Plaintiffs-Appellants,</td><td>)<br>)</td></tr>
</table>

ANGELO IAFRATE, SR., individually and as
trustee of the John Iafrate Irrevocable Trust
u/a/d 1/1/98; DOMINIC IAFRATE; ANGELO
E. IAFRATE,                                             )
                                                       )
                                                       )
                                                       )
                                                       )       ON APPEAL FROM THE UNITED
                                                       )       STATES DISTRICT COURT FOR
           Plaintiffs-Appellants,                      )       THE  EASTERN  DISTRICT  OF
                                                       )       MICHIGAN
v.                                                     )
                                                       )
ANGELO     IAFRATE,     INC.;     ROBERT               )
ADCOCK,                                                )
                                                       )
           Defendants-Appellees.                       )

**BEFORE:** CLAY, COOK, and WHITE, Circuit Judges.

**CLAY, Circuit Judge**. Plaintiffs, members of the Iafrate family and sellers of a successful construction company, have filed this securities fraud lawsuit against Defendants, the company that was formed to purchase the construction company, and the company's president. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Plaintiffs fully financed the sale of their construction company at below-market rates as part of a financial transaction designed to benefit their employees. In exchange, Plaintiffs received promissory notes for the value of the purchase price and stock warrants ("the Warrants") that were redeemable for shares at a set price or for cash. A Warrant could only be exercised after its holder was fully repaid for his portion of the financing.

Plaintiffs contend that Defendants defrauded them of the Warrants' value because Defendants refused to honor several of the Warrants, claiming their exercise period had expired, and because the company's president allegedly manipulated the value of the company's stock. The district court granted Defendants' motion to dismiss for failure to state a claim on which relief can be granted. For the reasons stated in this opinion, we **AFFIRM** the district court's judgment.

## BACKGROUND

In 1969, Plaintiff Angelo Iafrate, Sr. ("Angelo Sr.") incorporated the Angelo Iafrate Construction Company ("AICC") in Michigan. AICC issued shares in the company to each of Angelo Sr.'s sons: Plaintiffs Dominic, John, and Angelo E., as well as his daughter Anna, who is now deceased.[1] In 2012, Angelo Sr. and his three sons decided to sell AICC. They agreed to sell their interests in the company to its employees via an Employee Stock Ownership Plan ("ESOP").

An internal committee was established within AICC to explore the process of creating an ESOP and an outside consulting firm, Stout Risius Ross ("SRR"), was engaged to guide AICC through the process. SRR recommended that the Iafrates finance 100% of the purchase price of the company through a loan to the ESOP, because conventional financing is rarely available for ESOP transactions. Plaintiffs agreed and provided $36.7 million to finance the sale of AICC. A new company was formed to complete the transaction: Angelo Iafrate, Inc. ("AIC" or "the Company"), and the Iafrates contributed all of their stock in AICC to this Company in exchange for 30,000 shares of its stock. The Iafrates then disbursed their loan to the Company, which proceeded to form an ESOP that used the Iafrates' funds to purchase the entirety of the Iafrates' 30,000 shares in the Company. The transaction closed in December 2013. Each Iafrate was issued

---

[1] John Iafrate's interests are held by the John Iafrate Irrevocable Trust, and it is the Trust, rather than John, that is a named plaintiff in this case.

a senior and junior promissory note ("the Notes") to cover their portion of the loan. The Notes contained mandatory and discretionary prepayment periods outlining how the Company would satisfy its obligation to Plaintiffs for the debt of the purchase price. The Notes also contained provisions requiring that all prepayments must "be applied *pro rata . . .* based on the remaining principal balance of each note." (*See, e.g.*, R. 25-3, Senior Promissory Note to Angelo Sr., PageID # 423.)

> Plaintiffs separately entered into an Intercreditor Agreement that provided:
>
> In the event a Creditor receives any payment on the Creditor Indebtedness . . . prior to the time all of the Creditor Indebtedness shall have been fully paid, that Creditor shall receive and hold the same in trust for the benefit of all Creditors and shall forthwith apply the same Pro Rata against the Creditor Indebtedness.

(R. 25-5, Intercreditor Agreement, PageID # 459.) This meant that if one of the Iafrates received a prepayment on his Note while the others did not, then the one who was paid would hold the payment in trust for the benefit of the others so it could be applied *pro rata* to each Iafrate's Note. The Agreement also stated that "[a]ll undertakings, agreements, representations and warranties contained in this Agreement are solely for the benefit of the Creditors and there are no other parties, including, without limitation, the Borrower, who are intended to be benefited in any way by this Agreement." (*Id.*)

Plaintiffs' $36.7 million loan was provided at a below-market interest rate and secured only by a stock pledge from the Company. However, to compensate Plaintiffs for the low interest rate and to provide Plaintiffs with a reasonable rate of return on their loan, the Company also granted each Iafrate a Warrant. Each Warrant provided the Holder (i.e., an Iafrate) the right to either purchase a specified number of shares at an exercise price of $225 per share or for the Company to purchase those shares from the Holder at the market rate less the exercise price. Each Warrant also contained a term limit: "This Warrant shall terminate on, and may no longer be exercised on

or after, the date that is 60 days after the date that the Company has paid in full both the Senior Promissory Note and Junior Promissory [Note] issued by the Company in favor of the Holder." (R. 25-2, Common Stock Warrant, PageID # 402.)

After the sale was complete, Robert Adcock, the former executive vice president of AICC, became president of the Company and a co-trustee of the ESOP. Dominic, Angelo E., and Michael Stefani (the Iafrate's family attorney) became members of the Company's Board of Directors. In January 2016, Angelo E. resigned from the Board.

On March 25, 2016, Adcock told the Board that he had asked AIC's bonding company for permission to make a $4,000,000 prepayment on each of the outstanding Notes. The bonding company denied this request. Following the March 25 meeting, Angelo E. informed Adcock via email that he wanted any prepayments that might be made to him to instead go entirely to Angelo Sr., his father. Angelo E. wrote:

> [I]f you eventually do any prepayment now or more down the line, I request only one thing. I want 100% of any prepayment amounts only to the extent of my pro-rata prepayment allocation (I only speak for myself and only my note and no other family member on this directive) to be paid to my Dad exclusively in lieu of me. If any waiver or some other kind of documentation is needed to reflect that directive, please send that paperwork to me direct.

(R. 25-6, Email from Angelo Iafrate, Jr. to Bob Adcock, PageID # 470.) There is no evidence in the record of any paperwork containing an express "waiver or some other kind of documentation" to reflect Angelo E.'s "directive." (*Id.*) Nevertheless, on November 22, 2016, the AIC Board approved a $5,400,000 prepayment to Angelo Sr. Adcock represented to the Board that the bonding company had approved the prepayment and that Angelo E., the John Iafrate Trust, and Dominic had each agreed that any prepayment "should be applied first to pay off the notes to Angelo Iafrate Sr." (R. 25-7, 11-26-2016 AIC Board Meeting Minutes, PageID # 474.) The Board, which still included Dominic and Stefani, unanimously approved the prepayment. The payment

was made on or about December 20, 2016. In accordance with the terms of the Intercreditor Agreement, Angelo Sr. held the $5.4 million in trust for all Plaintiffs.

On or about February 17, 2017, Adcock allegedly directed the Company to fully repay the Notes held by Dominic Iafrate and the John Iafrate Trust. There is no documentation in the record reflecting a Board deliberation or decision for these repayments, but Plaintiffs allege that they each willingly accepted the funds and held them in trust in accordance with the Intercreditor Agreement. Nearly a year later, on February 2, 2018, Adcock directed a payment to Angelo E. that fully satisfied his Notes.

Believing all debts had been satisfied, Angelo Sr. and the John Iafrate Trust attempted to exercise their Warrants and they requested a cash payment. The Company refused to honor the Warrants, claiming that they expired sixty days after the respective payments were made to Angelo Sr. and the John Iafrate Trust—dates which had long since passed in 2016 and 2017, respectively. When Dominic Iafrate attempted to exercise his Warrant, his request was denied for the same reason. The only exercise the Company indicated it would honor was Angelo E.'s, as he made his request on March 20, 2018, which was within sixty days of receiving his prepayment.

On July 5, 2018, Plaintiffs filed a six count complaint against Defendants in federal district court. Count I alleged a violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiffs alleged that Adcock and the Company wrongly represented that the prepayments issued to Angelo Sr., Dominic, and the John Iafrate Trust were independent warrant-triggering events that activated the sixty day exercise term limit. Count II alleged a violation of Section 10(b) and Rule 10b-5 as it relates to Adcock's and the Company's efforts to manipulate the value of the Warrants. Plaintiffs alleged that Defendants reduced the value of Angelo E.'s Warrant by undervaluing the

Company's stock price. Counts III through VI alleged various state law claims including breach of contract, mutual mistake, unjust enrichment, and fraud, all in connection with the ESOP transaction and subsequent repayment of the Notes.

On April 25, 2019, the district court granted Defendants' motion to dismiss for failure to state a claim upon which relief can be granted. The court dismissed Plaintiffs' securities fraud claims (Counts I and II) and dismissed the remaining state law claims without prejudice. Plaintiffs' timely appeal followed.

## DISCUSSION

We review a dismissal for failure to state a claim upon which relief can be granted *de novo*. *Dubay v. Wells*, 506 F.3d 422, 427 (6th Cir. 2007); *Lambert v. Hartman*, 517 F.3d 433, 438–39 (6th Cir. 2008). In conducting this review, we "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Section 10(b) of the Securities and Exchange Act of 1934 makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements this provision and prohibits "mak[ing] any untrue statement of a material fact" in connection with the purchase or sale of securities, or failing to disclose a material fact "in order to make the statements made . . . not misleading." 17 CFR § 240.10b-5(b) (2010). A plaintiff's allegations must establish the following six elements to state a claim under Section 10(b) and Rule 10b-5: "(1) a material misrepresentation

or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011)).

Federal Rule of Civil Procedure 9(b) applies to fraud actions, such as Rule 10b-5 violations, and requires a party to "state with particularity the circumstances constituting fraud." This standard requires plaintiffs to "[a]t a minimum . . . allege the time, place and contents of the misrepresentations upon which they relied." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008). The Private Securities Litigation Reform Act of 1995 ("PSLRA") similarly heightens the pleading standards for securities fraud claims. It requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Also, "the complaint shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A).

### I. Material Omissions Regarding the ESOP Transaction

Plaintiffs claim that Adcock and the Company misled them during the ESOP transaction in 2013 by misrepresenting that any non-*pro rata* prepayments that might be made on the Notes would not be construed as warrant-triggering events. Plaintiffs further claim that Defendants failed to update Plaintiffs in 2016 and 2017 when Defendants' interpretation of the deal documents

allegedly changed, and Defendants decided that non-*pro rata* prepayments that fully satisfied a Plaintiff's senior and junior notes would in fact be treated as warrant-triggering events.

The district court held that at the time of the ESOP transaction in 2013, the Company had not yet adopted the "view that the warrant clock began ticking upon payment of an individual holder's notes." (R. 47, Dist. Ct. Order, PageID # 756). Therefore, no material omission could have occurred at that point. The court further found that in 2016 and 2017 Adcock had no duty to disclose or update Plaintiffs regarding the Company's interpretation of the Warrants. The court also held that even if Adcock had a duty to disclose the Company's position in situations where its position made his earlier representations false or misleading, "Adcock's subjective interpretation of a contractual provision would not fall within these disclosure requirements." (*Id.* at PageID # 756–57.) Instead, "at most, he changed his interpretation of a single clause in the Common Stock Warrant to the benefit of ESOP participants." (*Id.* at PageID # 757.)

On appeal, Plaintiffs contend that in 2016, "Adcock stated that Defendants would execute amended documents before any payments would be applied in a non-pro rata manner," but no such documents were ever executed. (Appellants' Br. at 24.) Plaintiffs allege that this "purposely caus[ed] the Iafrates to believe the original deal remained unchanged—but Defendants nonetheless secretly began applying payments in a non-pro rata manner, despite promising that they would not do so." (*Id.*) Defendants allegedly told "the Iafrates how they, the Defendants, would automatically redeem the Warrants only after **all** of the Notes were paid—and then they changed their mind, midstream, but deliberately took steps to mislead the [Plaintiffs] into believing the old interpretation would still govern." (*Id.* at 36.)

Plaintiffs apparently believed throughout the course of the deal that the Warrants would be automatically redeemed for cash after all of the Notes were paid back *pro rata*. But that assumption

neither means Defendants had a legal obligation to ensure that events would unfold that way, nor that Defendants committed securities fraud when they failed to warn Plaintiffs that their rights under the Warrants would expire sooner than the Plaintiffs allegedly expected.

The terms of the Warrants are unequivocal: "This Warrant shall terminate on, and may no longer be exercised on or after, the date that is 60 days after the date that the Company has paid in full both the Senior Promissory Note and Junior Promissory [Note] issued by the Company in favor of the Holder." (R. 25-2, Common Stock Warrant, PageID # 402.) Plaintiffs do not contest that this provision means what it plainly says, but instead they assert that this interpretation of the Warrants "is expressly rejected by the terms of the Notes and the Intercreditor Agreement, both of which unambiguously state that irregular application of payments *cannot* occur." (Appellants' Br. at 11.) They contend that the sixty day Warrant exercise period could not have begun until each Iafrate was fully repaid "*even if he received payments prior to the others*, because all parties agreed that any such irregularly timed payments would nonetheless be *accounted for* pro rata." (*Id.*) Any other interpretation of the documents, Plaintiffs say, would render "the extensive pro rata commitments contained in the Notes and Intercreditor Agreement . . . entirely superfluous." (*Id.*) Plaintiffs also rely on a purported statement by Adcock following Angelo E.'s 2016 email to Adcock asking the Company to repay his father's loans first, in which "Adcock specifically confirmed to Angelo that the non-pro rata payments would *not* impact the previously agreed pro rata *application* of those payments, or the long-agreed automatic redemption of the Warrants all at one time." (*Id.* at 36–37.) Therefore, Plaintiffs conclude, Defendants' failure to update Plaintiffs when Defendants decided that they would repay the Notes non-*pro rata* and would not automatically redeem the Warrants, constituted securities fraud. (*Id.*)

9

Plaintiffs fail to identify any affirmative statement by Defendants establishing that the Company would only apply prepayments *pro rata*, that even if non-*pro rata* prepayments were made they would not trigger the warrant-exercise period, or that the Warrants would be redeemed automatically. Plaintiffs' allusion to Adcock's alleged statement that any non-*pro rata* payments would not change the "previously agreed *pro rata* application of those payments, or the long-agreed automatic redemption of the Warrants all at one time" does not suffice. (*Id.* at 36–37.) Adcock's alleged omission of his interpretation of the Warrants and "prediction" of how the Company would apply the prepayments and not automatically redeem the Warrants constitutes "soft information." *In re Omnicare*, 769 F.3d at 470. "Soft information" is contrasted with "hard information," which is typically "historical information or other factual information that is objectively verifiable." *Id.* at 470. Statements concerning "hard information" are "actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading." *Id.* However, an omission of "soft information" is only actionable as securities fraud if "the new information [is] so concrete that the defendant must have actually known that the new information renders the prior statement misleading or false and still did not disclose it." *Id.* at 471. Adcock's purported failure to inform Plaintiffs that the Company would not honor its commitment to only apply prepayments *pro rata* and to automatically redeem the Warrants did not render any prior statement "misleading or false," *id.* at 471, because Plaintiffs do not allege, with sufficient particularity, statements establishing the Company's commitment to do so in the first place.

Plaintiffs also seek to rely on statements made by actors involved in the 2013 ESOP transaction besides Defendants, including AICC's internal exploratory committee and the law firm Walter, Norcross, and Judd that drafted the transaction documents, in contending that "[a]t all

times, it was the understanding and agreement between the parties to the transaction . . . that a cash redemption of the stock corresponding to each Warrant would be automatic upon the payment of the Junior and Senior Notes." (R. 13, First Am. Compl., PageID # 207.) But these are not specific statements by Defendants that the Warrants would be automatically redeemed contrary to their plain terms. This is fatal to Plaintiffs' securities fraud claim pursuant to the heightened pleading requirements of Rule 9(b) and the PSLRA.

The documents governing the 2013 ESOP transaction and the subsequent repayment of the Notes further dispel any claim of misrepresentation or material omission. These documents contemplated non-*pro rata* payments and required the Iafrates to affirmatively exercise their Warrants within sixty days of repayment of their respective Notes. This undermines Plaintiffs' claim "that the terms of the Notes and the Intercreditor Agreement . . . unambiguously state that irregular application of payments *cannot* occur." (Appellants' Br. at 11); s*ee United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003) ("The intent of the parties is best determined by the plain language of the contract."). For one, the sixty day exercise term contained in each Warrant begins after "the Company has paid in full both the Senior Promissory Note and Junior Promissory [Note] issued by the Company in favor of the Holder." (R. 25-2, Common Stock Warrant, PageID # 402.) This use of the singular "Holder" rather than plural "Holders," indicates that any Holder (i.e., one of the Iafrates) could be paid "in full" before the others, thereby triggering the sixty day exercise period for that Holder alone. This language also shows that a non-*pro rata* prepayment that satisfied one of the Iafrate's Notes would trigger their respective Warrant's sixty day exercise period.[2]

---

[2] While this provision arguably conflicts with the terms of the Notes, which provide that prepayments "shall be applied pro rata to the Sellers' . . . Notes," part of Plaintiffs' state law breach of contract claim makes this precise allegation, (R. 13, First Am. Compl, PageID # 215). That said, Plaintiffs

Additionally, the Intercreditor Agreement specifically provides that "[i]n the event" one of the Plaintiffs receives a prepayment before the others "have been fully paid," that Plaintiff "shall receive and hold the same in trust for the benefit of all Creditors and shall forthwith apply the same Pro Rata against the Creditor Indebtedness." (R. 25-5, Intercreditor Agreement, PageID # 459.) This means that if one of the Iafrates were to be sent a non-*pro rata* prepayment from the Company, he was to receive the prepayment and hold it in trust for the others in order to apply it *pro rata*. But the only reason such a provision would be necessary would be to ensure that the Plaintiffs received the prepayments on their Notes in a *pro rata* fashion, even if the Company did not remit them *pro rata*. Contrary to Plaintiffs' suggestion, it is this provision that would be superfluous if there was no possibility of non-*pro rata* prepayments.

Angelo E., as the then-president of the Company, did sign on the Company's behalf an Acknowledgment of the Intercreditor Agreement. The Acknowledgment provides that the Company, in relevant part, "agrees to be bound by the provisions of the foregoing Intercreditor Agreement as they relate to the relative rights of the Creditors in the Collateral." (R. 25-5, Intercreditor Agreement, PageID # 463.) This vague provision does not require the Company to only issue *pro rata* prepayments, nor does it require the Company to abide by any specific payment terms. In fact, the apparent purpose of the Intercreditor Agreement—to ensure that the Iafrates

---

accepted each of the non-*pro rata* prepayments proffered by Defendants. In any event, Plaintiffs have failed to allege specific statements by Defendants that misled Plaintiffs into believing that non-*pro rata* prepayments would not occur. That means Plaintiffs' securities fraud claim fails, regardless of how viable their contract claim is. This is also why Adcock's failure to issue new documents in response to Angelo E.'s email regarding direct prepayments to his father does not constitute securities fraud. From Defendants' perspective all that had changed is that Angelo E. was signaling his consent to a non-*pro rata* prepayment, which was subsequently made by Defendants. As noted above, the deal documents already contemplated this possibility and so nothing needed to be executed because the terms of the deal were not being modified. To the extent Defendants misunderstood the contract and new documents were required to modify the terms of the deal, Plaintiffs may seek relief through their state law claims.

applied any non-*pro rata* prepayments made by the Company in a *pro rata* fashion among themselves—would be defeated if this Acknowledgment required the Company to only make *pro rata* prepayments.

Ultimately, Plaintiffs, to their detriment, failed to exercise their Warrants within the applicable time limit. In this suit, they have failed to identify "a material misrepresentation or omission by the defendant" as required by Section 10(b) of the Securities and Exchange Act. They have also failed to plead with particularity "the circumstances constituting [the] fraud," Fed. R. Civ. P. 9(b), as well as "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). While Plaintiffs' error may constitute a windfall for Defendants because the purported purpose of the Warrants was to compensate the Iafrates for fully financing the ESOP, Defendants' statements and actions in the course of the transaction do not support a claim of securities fraud. Plaintiffs' failure to understand the consequences of the terms of their deal with Defendants does not mean Defendants violated federal securities law by not correcting Plaintiffs' mistaken impression.

## II. Manipulation of the Company's Stock Price

In Count II of their complaint, Plaintiffs allege that Adcock manipulated the Company's financial statements and intentionally undervalued its share price, thereby diminishing the value of Angelo E.'s Warrant. But the district court found that because Adcock admitted this to Angelo E. in February 2018, a month before Angelo E. exercised his Warrant on March 20, 2018, Plaintiffs have not met the "reliance" requirement for a Section 10(b) and Rule 10b-5 claim. (R. 47, Dist. Ct. Order, PageID # 757–58.) Adcock purportedly told Angelo E. in February 2018, that "I am not going to bullshit a bullshitter, we undervalued the stock." (R. 13, First Am. Compl., PageID # 206.) The district court found that Angelo E.'s exercise of his Warrant after learning that Adcock had

13

undervalued the market price of the stock "undermines Plaintiffs' claim that Angelo [E.] justifiably relied on Adcock's misrepresentations." (R. 47, Dist. Ct. Order, PageID # 757–58.) As a result, "Plaintiffs have failed to state a plausible claim for relief under § 10(b)-5." (*Id.* at PageID # 758.)

Angelo E. learned from Adcock that the Company's stock had been manipulated and yet he still decided to exercise his Warrant. As a result, he could not have relied on the inaccurate stock price in conducting this securities transaction. Plaintiffs emphasize that the Company's Articles of Incorporation prohibited Angelo E. from owning shares because he is a non-employee. This means Angelo E. had no choice but to exercise his Warrant for cash, rather than redeem it for shares in the Company. Therefore, this was a "forced sale," and in such situations courts in other circuits have avoided imposing the reliance requirement to state a claim for securities fraud. (Appellant's Br. at 48–49.) But in those cases, the defendant intended to force the plaintiff to sell their shares. *See, e.g.*, *Vine v. Beneficial Fin. Co.*, 374 F.2d 627, 635 (2d Cir. 1967) ("[S]ince the complaint alleges that plaintiff . . . has been forced to divest himself of his stock and this is what defendants conspired to do, reliance by plaintiff on the claimed deception need not be shown."). In the present case, the parties agreed to the terms of the Warrants and intended for them to be exercised for shares or cash. Even if the negotiated term in the Warrants permitting the Iafrates to exercise them for shares is unenforceable, Plaintiffs do not allege facts showing that this term, in conjunction with Adcock's stock manipulation, was part of a conspiracy to force the Iafrates to exercise their Warrants for cash. *See Twombly*, 550 U.S. at 570 (holding that a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face").

Plaintiffs' allegations may support a breach of contract claim that Defendants did not honor the requirement in Angelo E.'s Warrant that shares be purchased at their fair market value. But Angelo E. did not challenge the stock valuation or sue for breach of contract before he exercised

his Warrant for cash. Both options were available given Angelo E.'s knowledge of the stock manipulation. Therefore, even if Adcock's alleged stock manipulation constituted a material misrepresentation, Plaintiffs' claim fails because they cannot show that Angelo E. reasonably relied on that misrepresentation in the course of a securities transaction.

## CONCLUSION

For the reasons provided above, we **AFFIRM** the judgment of the district court dismissing Plaintiffs' complaint.

No. 19-1631, *Angelo Iafrate Sr., et al. v. Angelo Iafrate Inc., et al.*

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part**. I concur in the affirmance as to Count II and dissent as to Count I.

I see the issues in Count I somewhat differently than my colleagues and the district court. The dispute is not so much about when the Warrants were triggered and expired as it is about the method of accounting for the non-pro rata payments that led to the triggering event (note payoff). As noted by all, the Warrants say what they say; and, to the extent Plaintiffs seek to base a 10(b) claim on the theory that they believed the Warrants meant something else, I agree that they fail to state a claim. But the sixty-day exercise period provided for in the Warrants would not have begun to run had the prepayments been accounted for on a pro rata basis as stated in the notes. That is the gist of Plaintiffs' complaint.

The notes expressly state that any prepayments "shall be applied pro rata . . . based on the remaining principal balance of each note." R. 25, PID 423, 440. If the prepayments had been accounted for in this fashion, all the notes would have been satisfied simultaneously, triggering the sixty-day-Warrant-exercise period for all the Warrants, and all the attempts to exercise would have been timely. Plaintiffs allege that Adcock and the ESOP changed the accounting method, which resulted in the Warrant-exercise periods being triggered in a staggered fashion, and deliberately hid the change in method from Plaintiffs until it was too late for the earlier-triggered Warrants to be exercised. Thus, the alleged fraud was in applying the payments non-pro rata without informing Plaintiffs, when Defendants knew Plaintiffs were relying on the pro rata method set forth in the notes.

It is true that a simple breach of contract that happens to involve a security does not automatically support a viable 10(b) claim. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 776 (2d Cir. 1991). But here, Plaintiffs have alleged more than a contract breach. They allege that Adcock

16

(who stood to reap great personal gain) and the ESOP breached the terms of the junior and senior notes surreptitiously for the purpose of triggering the Warrant-exercise period without Plaintiffs' knowledge and inducing Plaintiffs to fail to timely exercise their rights under the Warrants and thereby forfeit their value.

The fact that Plaintiffs knew that prepayments were being made—indeed requested that they be made—on some notes before others does not mean that they knew the prepayments were not being applied pro rata for accounting purposes. Plaintiffs' attempts to simultaneously exercise their rights under the warrants clearly suggest otherwise. Thus, the fact that non-pro rata prepayments were permitted and accepted is irrelevant. Maj. Op. at 11–12. And it is unnecessary to rely on the intercreditor agreement because the notes themselves required pro rata accounting. Maj. Op. at 12–13.

It is unfair to characterize this case as involving Plaintiffs' simple failure to "understand the consequences of the terms of their deal" and timely exercise their rights, to their detriment. Maj. Op. at 13. The Warrants were clear; the fact that the prepayments were being applied contrary to the parties alleged understanding and the notes was not.

Plaintiffs' First Amended Complaint adequately pleaded a 10(b) claim as set forth above. Plaintiffs alleged that Defendants agreed to apply any note prepayments pro rata; that Defendants knew Plaintiffs were relying on that method of accounting for purposes of determining when the Warrants would be triggered; that Defendants unilaterally changed the method of accounting without telling Plaintiffs; that Defendants failed to inform Plaintiffs of the change intentionally, so as to deprive them of the value of their Warrants; that Plaintiffs relied on the documents and the mutual understanding of the deal; and that Plaintiffs lost the value of their Warrants as a result.

As to the stock-price manipulation claim, the case law seems to support the district court's dismissal of that claim. There is no question that Defendants' alleged price manipulation did not induce Angelo E. to redeem his Warrant. He planned to do so and, indeed, was compelled to do so by the differential between the strike price and any plausible valuation of the stock. Although the factual allegations describe stock-price manipulation, Plaintiffs have cited no case, and I have found none, that excuses the reliance element where the sale or purchase was not causally related to the alleged fraud.

For the foregoing reasons, I would reverse the dismissal of Count I, affirm the dismissal of Count II, and remand for further proceedings.